Hulen Lee Wilson was indicted for the first degree murder of James Davis "by shooting him with a shotgun". The jury found the appellant "guilty of murder as charged" and the trial court set sentence at 25 years' imprisonment.
The homicide out of which this indictment arose occurred on the early morning of February 9, 1982, at the house trailer at which the appellant and the deceased resided in Shelby County. There was evidence in the record to indicate that the two men, together with some companions, had been drinking heavily during the preceding evening before the homicide occurred.
Because reversible error occurred during the examination of one of the witnesses for the State, this court pretermits consideration of the evidence in this cause and expresses no opinion thereon.
 I
Dr. Joseph Embry, a Forensic Pathologist with the State Department of Forensic Sciences, after giving his qualifications, stated that he performed an autopsy on February 9, 1982, on the body of one James Davis. He stated that Davis' death was due to a "shotgun wound in the base of the neck, just above the collar bone."
Dr. Embry was then asked to examine certain photographs, which he did, and then described the wounds in some detail, showing the entrance and exit of the pellets through the victim. The doctor then described the trajectory or angle at which, from his examination, these pellets would have entered the body from a horizontal plane. His answer was: (R. 126).
 "A. If this is a ninety degree angle with the horizontal or the plane parallel to the floor and this is a zero degree angle, this is thirty-sixty-ninety. I estimate it was approximately seventy-five degrees."
The record then continues as follows: (R. 126-129)
 "Q. Were you able to determine whether the shot came from above Mr. Davis or below?
"MR. PINO: Objection, your Honor.
"THE COURT: Overruled.
 "MR. PINO: That calls for mere speculation on the part of the witness.
"THE COURT: Overrule.
"MR. PINO: Exception.
 "Q. Doctor, were you able to make a determination as to whether the shot came from above him or below him?"
 "A. Without knowing more about the circumstances, no, sir.
 "Q. Were you able to determine the trajectory of the shot once it entered the body?
"A. Yes, sir.
"Q. And what was that trajectory, please sir?
 "A. Well, I must not understand, because I thought you had asked me that before — downward and backward with no definite deviation to the right or left.
 "Q. All right, but the shots were downward toward his body?
"A. That is correct.
"MR. PINO: We object, Your Honor.
 "THE COURT: Well, he has already testified to that — overruled.
 "Q. Doctor, based on your training as a Forensic Pathologist and based on your examination of Mr. Davis and assuming State's Exhibit Number Twelve is the weapon that was used in this case; could you demonstrate to the Ladies and Gentlemen *Page 893 
of the Jury the position this shotgun would have had to be in to have made the wound that was incurred on Mr. Davis' body?
 "MR. PINO: Your Honor, object, objection for the record — number one, this witness is not a ballistics expert and number two, there is absolutely no way, he has already testified, there is no way for him to determine whether the shot came from above him or below him. So he is obviously not competent to testify as to the direction or the way or manner which the weapon was held at the time it was allegedly fired.
 "THE COURT: If he has an opinion as to how it was fired, I will let him testify.
"MR. PINO: We except.
"Q. Doctor, would you demonstrate?
 "A. Assuming that you are the shooter and I am the shootee and we are both on level ground then all that needs to be is that the shotgun needs to be parallel to the path; in other words I would have to be approximately this position (demonstrating).
"Q. If I hold the gun like this (demonstrating)?
"A. Yes.
 "Q. Doctor, also based on your examination of Mr. Davis' body, internally and externally and your training as a Forensic Pathologist, I show you what has been marked as State's Exhibit Number Five, which purports to be a photograph of some bloodstains and I will ask you to take a look at that, please sir?
"A. (Witness complies.) Yes, sir.
 "Q. All right, for the purpose of my example, I would ask you to assume those bloodstains came from the body of the deceased, Mr. `Jim' Davis, and I would ask you to further assume they were thirty-four inches from the floor. . . .
"A. Yes, sir.
 "Q. And I would further ask you to assume that the positions that we just demonstrated, before the Ladies and Gentlemen of the Jury, where I stood with the shotgun in this position and you were mounted on the floor, would that be consistent with your findings of your examination of Mr. Davis' body?
"MR. PINO: Objection, Your Honor.
"THE COURT: Overruled.
"A. Yes, sir.
 "Q. Now. Doctor, first of all, based on your training as a Forensic Pathologist and, also, based on your examination of Mr. Davis' body, did you come to a conclusion as to the cause of his death?
"A. Yes, sir.
"Q. What was that?
"A. He died from a shotgun wound to the neck.
 "Q. Doctor, assuming the same facts and your same training, do you have an opinion as to the mechanism of his death?
 "A. It was a combination of bleeding out or extraneous and asphyxia due to aspiration of the blood.
 "Q. Doctor, assuming that Mr. Davis had been shot, as we previously described, do you have an opinion as to how long he could have lived following that shot?
 "A. It would have been a rapidly fatal wound; within a few minutes he would have been dead.
 "Q. Do you have an opinion whether or not he could have moved or made any movement of his body after he was shot?
 "A. I do, I believe it is possible he could have moved around some, yes.
 "MR. HILL: That is all that we have at this time, Your Honor."
As may be seen in the above colloquy, the trial court, over the strenuous objection of defense counsel, permitted Dr. Embry to then demonstrate by kneeling and giving his opinion as to the relative position of the respective parties at the time of the shooting.
This testimony and demonstration clearly violates the rule stated for this court by Judge Bowen in Ivey v. State,369 So.2d 1276 (Ala.Cr.App.) cert. denied, 369 So.2d 1281 (Ala. 1979), as follows:
 ". . . [T]he rule stated in Crawford v. State, 262 Ala. 191, 192, 78 So.2d 291 (1955), and Padgett v. State, 49 Ala. App. 130, 136, 269 So.2d 147, cert. denied, 289 Ala. 749, 269 So.2d 154 (1972)" indicates: *Page 894 
 "This rule states that in a murder prosecution it is not permissible for a witness, including a medical expert, to draw conclusions for the jury as to the relative positions of the parties at the time of the shooting from a mere examination of the wounds. It is not competent for a witness, expert or nonexpert, to draw inferences for the jury from the slant or angle of the wound as to the relative positions of the combatants when the fatal shot was fired. `This would be invasive of the province of the jury and a matter of which they would be quite as competent to judge as the witness, having been given a description of the wound.' Mathis v. State, 15 Ala. App. 245, 248, 73 So. 122, 124 (1916)."
We pretermit consideration of other assignments of error raised in brief as they are not likely to occur on retrial of this cause.
For the reasons set out herein, the judgment of conviction is due to be reversed and the cause is hereby remanded.
REVERSED AND REMANDED.
DeCARLO, P.J., and HARRIS and BOWEN, JJ., concur.