Richmond Clayton Smith was indicted for the intentional killing of one Charles Franklin Simmons by "shooting him with a rifle and/or pistol", in violation of § 13A-6-2, Code of Alabama 1975. The jury found the appellant "guilty of murder as charged" and following a sentencing hearing, the trial court fixed punishment at 15 years in the penitentiary.
The appellant does not challenge the weight and sufficiency of the evidence. Therefore, rendering a complete statement of facts is unnecessary. The facts necessary for a discussion of the issues are set out within appellant's issues presented for this court's review.
 I
Appellant argues that the trial court committed reversible error in failing to suppress his statement given to the investigating officers. He alleges the statement was involuntary because he was intoxicated, emotionally disturbed and severely beaten.
Charles Sharit testified that he was employed by the Jefferson County Sheriff's Department. On September 2, 1981, he received a dispatch that gunshots were heard in the area of apartments 503 and 504, Pinson Place Apartments. When he arrived at the apartment complex, one Charles Ellison, a resident of 507 Pinson *Page 1028 
Place Apartments, told Sharit that he heard "gunshots and then some fighting and some more gunshots coming from Apartment 503 or 504 . . ." (R. 4).
Deputy Sharit, Deputy Creel and Sergeant James went up the stairway at the apartment complex and as they reached the top of the stairs the appellant stepped out of apartment 504 and said he had been shot. Appellant had blood all over his face, hands, arms and clothes. Deputy Sharit noticed the door to the apartment next to 504, apartment 503, was partially open. He looked inside and saw a man lying on the floor with blood all over him. At this time they called the paramedics. Sergeant James sat down with the appellant at appellant's kitchen table until the paramedics arrived. The paramedics cleaned the appellant up, put a bandage on a cut over appellant's eye, and left.
Sharit stated that he could smell a strong odor of alcohol on appellant's breath but he could not say whether appellant appeared to be intoxicated because of appellant's head injury. When the paramedics left, Sharit, Sergeant James, Deputy Williams and Deputy Creel took a statement from the appellant. Appellant was asked whether he wanted to give a statement and he responded that he did. The appellant was read his Miranda
rights at this time. Sharit further stated that the appellant was not threatened, forced, coerced or induced into making a statement, nor was appellant promised any benefit or reward to make the statement. After the appellant gave the statement to the officers he was arrested by Sergeant House.
The appellant testified that on September 2, 1981, he was living at 504 Pinson Place Apartments. In the late night hours of September 1, 1981, and early morning hours of September 2, 1981, the appellant went to the deceased's apartment and along with several other people consumed a case and one-half of beer and a fifth of whiskey.
The appellant further testified that he remembered the police coming to his apartment and that he was injured. Appellant talked with the officers but alleged that he was "drunk". He stated that while he was in his apartment the officers did not read his "rights" to him. Appellant could not recall talking with the officers after the paramedics treated him for a cut over his eye. He further stated that he did not recall giving a statement to officers about the events that took place earlier that night.
Robert Trautwein testified that he was a fireman paramedic. On September 2, 1981, he was called to Pinson Place Apartments. Upon arriving at the apartment complex he was directed into apartment 504 where he met appellant. The appellant was bleeding from the head and asked if he had been shot. Trautwein cleaned the appellant up, bandaged a cut over the appellant's eye and checked appellant's vital signs.
Trautwein testified that he could smell alcohol on appellant's breath but that the appellant was not drunk. Appellant did appear to be confused and a little upset. (R. 86). Appellant had a slight slurring of speech but was cooperative with Trautwein. Since the appellant was okay, Trautwein began to leave the apartment. As he was leaving he heard the officers begin questioning the appellant and advising him of his Miranda rights. (R. 77).
The State must show voluntariness and a Miranda predicate in order for a statement to be deemed admissible. Thomas v. State,373 So.2d 1149 (Ala.Crim.App.), affirmed, 373 So.2d 1167 (Ala. 1979). "The voluntariness of an alleged confession is a question of law addressed to the trial court whose ruling, upon preliminary proof, will not be disturbed on appeal unless it appears to be contrary to the great weight of the evidence or is manifestly wrong. Garrison v. State, Ala.Cr.App.,372 So.2d 55 (1979). The degree of intoxication which would affect the voluntariness of a statement is a question of fact initially addressed to the trial court and, depending upon its ruling, then to the jury for its consideration. Scott v. State, Ala.Cr.App., 333 So.2d 619 (1976); Winn v. State, 44 Ala. App. 271, 207 So.2d 138 (1968)." Tice *Page 1029 v. State, 386 So.2d 1180, 1185 (Ala.Crim.App.), cert. denied,386 So.2d 1187 (Ala. 1980).
This court stated in Boggan v. State, 455 So.2d 228
(Ala.Crim.App. 1984) that "in order for intoxication to render a confession inadmissible it must amount to a `mania' which impairs the will and mind to the extent that the person confessing is unconscious of the meaning of his words. A lesser state of intoxication will not render a confession inadmissible. Willis v. State, 342 So.2d 802 (Ala.Crim.App. 1976); Tice v. State, 386 So.2d 1180 (Ala.Crim.App. 1980);Palmer v. State, 401 So.2d 266 (Ala.Crim.App. 1981)." Boggan, supra at 236. See also, Kendrick v. State, 444 So.2d 905
(Ala.Crim.App. 1984) and Campbell v. State, 444 So.2d 913
(Ala.Crim.App. 1984).
"In Palmer v. State, 401 So.2d 266, 268 (Ala.Cr.App. 1981), the court held, `[W]here ample evidence, even though conflicting, exists from which the trial judge could conclude that the appellant was not intoxicated to the extent of mania, the admission of a confession for a jury's consideration is not an abuse of discretion.' In further regard to contradictory evidence at a voluntariness hearing, the court in Snider v.State, 422 So.2d 807 (Ala.Cr.App. 1982), held that when conflicting evidence is presented great weight will be given to the trial court's determination of the issue." Campbell, supra at 915. See also, Kendrick, supra at 910.
The prosecution brought forth testimony which properly showed that the appellant was advised of his Miranda rights, that he had not been threatened, coerced, intimidated or promised any reward for making a statement and that he freely and voluntarily waived his rights. The record indicates that the appellant was not injured severely and that he was "okay" before he made the statement. Further, in the present case, it was not demonstrated that the appellant was so intoxicated as to be at a point of "mania". The trial judge's conclusion that the statement was voluntary was adequately supported by the facts, and the trial judge properly admitted his statement into evidence.
 II
The appellant argues that the trial court committed reversible error in allowing into evidence matters allegedly obtained through an illegal search and seizure. He specifically argues that the search of appellant's apartment was not subject to any exception to the warrant requirement. Appellant argues that he gave officers permission to look through his apartment for any other persons that may have been there and not to search for any evidence.
The evidence on the search in question is in conflict. The defendant testified that he only gave consent to look for people. The testimony of Deputy Sharit indicated that the defendant gave his consent for the officers to search for persons and evidence. The trial judge heard the testimony outside the presence of the jury and determined that evidence obtained through the search and seizure in question was admissible. The trial judge was in a better position to resolve this conflict in the evidence and determine the facts surrounding the search and his determination will not be disturbed on this appeal. Further, the officers in this case had facts available to them which sufficiently furnished reasonable cause to go forward with the investigation and therefore search the apartment. See § 15-10-3, Code of Alabama 1975; Retowsky v. State, 333 So.2d 193 (Ala.Crim.App. 1976). At the time the search was conducted, the officers knew that Charles Simmons had been killed, the appellant had given a statement indicating his involvement, and the officers knew that the incident had occurred in two locations, the apartment of the deceased and appellant's apartment nearby.
Moreover, the United States Supreme Court in Thompson v.Louisiana, ___ U.S. ___, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984) held evidence in plain view may be justifiably seized when officers are on the scene conducting an investigation of a *Page 1030 
murder. Similarly, "the same doctrine may justify seizure of evidence obtained in the limited `victim-or-suspect' search discussed in Mincey [v. Arizona, 437 U.S. 385,98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) ]." Thompson v. Louisiana, supra at 412. Here, the evidence was discovered in plain view while the officers were attending to appellant's injuries and checking his apartment for other suspects.
The trial court did not err in denying the motion to suppress.
 III
The appellant contends that the trial court erred in allowing Sergeant Gibson to testify as to angles and paths of bullets. He argues that the witness was not properly qualified as an expert in ballistics and, thus, this testimony should not have been admitted.
Sergeant Gibson testified that he was in charge of evidence technicians and employed by the Jefferson County Sheriff's Department. He served as the evidence technician in the case at bar and collected evidence from the deceased's apartment and from the apartment of the appellant. He testified to the evidence collected in each apartment and identified photographs he had taken at the scene on September 2, 1981. During the testimony of Sergeant Gibson the following colloquy took place: (R. 190-191)
 "Q. Officer Gibson, did you observe any — did you observe the baseboard area in the kitchen of apartment 503?
"A: Yes, sir.
 "Q. What did you observe in the baseboard of the kitchen of 503?
 "A. I observed a hole which appeared consistent with that of a bullet hole.
 "MR. NAIL: Mark that for identification. (State's Exhibit 19 marked for identification.)
 "Q. I show you a photograph that has been marked for identification State's Exhibit 19 and I'll ask you to look at it, please, sir?
"A. Yes, sir.
"Q. What is that a photograph of?
 "A. That's a photograph of the kitchen area and the hole in the baseboard.
 "Q. There appears to be something like a string of some sort running from the refrigerator to the baseboard?
"A. Yes, sir.
"Q. What is that?
 "A. We used that string to run bullet paths, approximate paths the bullet took from one point to another.
 "Q. Why is the string running from the refrigerator to the hole in the baseboard?
 "A. I observed a mark on the refrigerator door which appeared to be where a bullet —
 "MR. JAFFE: We object. He's not qualified. The predicate hasn't been laid. He's not an expert in paths of bullets. It's his opinion.
 "THE COURT: I think he's been qualified. I'm overruling.
"MR. JAFFE: We except.
 "THE WITNESS: There appeared to [be] a mark on the refrigerator door where it appeared that a bullet had hit at an angle and ricocheted off.
 "MR. JAFFE: Same objection. Move to exclude based on the same grounds.
"THE COURT: Overruled.
 "THE WITNESS: Also a mark on the linoleum floor in front of the bullet hole in the baseboard where it appeared that something had struck the floor.
 "MR. JAFFE: May we have a continuing objection to the line of questioning concerning his testimony to the path of the bullet?
"THE COURT: You have it.
 "Q. Does the string from the mark on the refrigerator match up to the hole in the baseboard.
"A: Yes, sir.
"MR. NAIL: We would offer State's No. 19.
"MR. JAFFE: Objection based on the same grounds.
"THE COURT: Overrule it. Mark it in.
"MR. JAFFE: We except. *Page 1031 
"A properly qualified expert may testify to the `path of flight' or trajectory of the bullet . . . An expert may testify about the direction from which the bullet was fired or the blow was struck . . ." (Citations omitted). Ivey v. State,369 So.2d 1276 (Ala.Crim.App.), cert. denied, 369 So.2d 1281 (Ala. 1979). However, "a witness to testify as an expert must first be shown to be such" and a predicate must be laid "to show that the witness [is] an expert on the matter under inquiry". Jones v.State, 29 Ala. App. 126, 193 So. 179 (1939).
The appellant further argues that the witness was not qualified to form an opinion as to the direction from which the bullet was fired. Pursuant to a review of the record and the above authorities the trial court did err in allowing this
testimony. No predicate was laid to show that Gibson was anexpert in the field of ballistics. However, while it may have been error to allow such testimony, a review of the record does not indicate that Gibson was attempting to testify as to the direction from which the bullet was fired. He testified that a mark on the deceased's refrigerator appeared to be where a bullet had ricocheted. He followed this mark to a hole in the baseboard on the kitchen wall and attached a string from one point to the other. We fail to see how Gibson's testimony prejudiced or harmed the appellant. ARAP 45.
 IV
The appellant contends that the trial court erred in refusing to allow evidence of the deceased's reputation for violence.
The well settled rule in Alabama is "that evidence of the deceased's turbulent, violent and bloodthirsty character is not competent absent some evidence tending to show that the killing was in self-defense; that is, some overt act or hostile demonstration on the part of the deceased. Farley v. State,279 Ala. 98, 182 So.2d 364 (1966); Wright v. State, 252 Ala. 46,39 So.2d 395 (1949); Wells v. State, 187 Ala. 1, 65 So. 950
(1914); Green v. State, 143 Ala. 2, 39 So. 362 (1904)."Bankston v. State, 358 So.2d 1040, 1042 (Ala. 1978). See also, C. Gamble, McElroy's Alabama Evidence, § 33.01 (2) (3rd ed. 1977); Carter v. State, 356 So.2d 682 (Ala.Crim.App.), cert. denied, 356 So.2d 689 (Ala. 1978). "Such evidence is not available to the defendant if he or she is the aggressor.Sanders v. State, 242 Ala. 532, 7 So.2d 483 (1942); Rutledge v.State, 88 Ala. 85, 7 So. 335 (1889). However, on all doubtful questions of who is the aggressor, the bad character of the deceased for turbulence and violence should be admitted. DeArman v. State, 71 Ala. 351 (1882). When the evidence on self defense is sufficient to go to the jury, evidence of the deceased's bad character for turbulence and violence must be accepted. Brooks v. State, 263 Ala. 386, 82 So.2d 553 (1955);McGuff v. State, 248 Ala. 259, 27 So.2d 241 (1946); Rutledge v.State, supra." Bankston, supra at 1042.
While there was sufficient evidence for the jury to conclude that the appellant in this cause did not in fact kill in self-defense, there was sufficient evidence presented to go to the jury on the issue via the appellant's statement. The trial court charged the jury on the issue of self defense and we consider his action to be correct in so charging the jury. Therefore, this appellant should have been allowed to present the evidence in question and we must hold the trial court in error for the refusal of such evidence.
 V
Dr. Robert Brissie, the Chief Medical Examiner for Jefferson County, testified that he performed an autopsy on Charles Franklin Simmons on September 2, 1981. The cause of death was determined to be "exsanguination, or loss of blood, secondary to multiple, small caliber distant gunshot wounds." (R. 338). He further testified to a number of wounds present on the deceased and identified photographs of those wounds. Dr. Brissie then described the trajectory, slant, or angle at which, from his examination, these wounds were made *Page 1032 
upon the body from a standard anatomical position. In a number of instances he gave his opinion of the various positions the body would have to be in to receive such a wound. From the record: (R.309-352)
"Q. I would like to ask you this: In what position would the body of the deceased had to have been in for this bullet wound to enter at that angle, entered the body and exited and reentered the body?
"MR. JAFFE: Objection.
"THE COURT: Overruled.
"MR. JAFFE: Object on the grounds qualifications and the predicate hasn't been laid on what position would this body had to have been in.
"THE COURT: Overruled.
"A. It would be my opinion that the chest would have to be relatively straight with the abdomen and the upper part of the torso in an unbent orientation to the abdomen. It would be my opinion that maybe several possibilities.
"Q. Could you explain what those different possibilities are, please, sir?
"A. Well, it would be possible if an individual could keep from bending the back down as they bent over but just bent at the hip area they could have been leaning forward. It would be my opinion that would not usually be the orientation of the back as one ordinarily bent the back. It would be possible that an individual could have been in a supine position.
"Q. What do you mean by supine?
"A. I mean lying on the back. It could be possible if one individual were shooting from a great height, such as the top of the building, you could get a similar angle while the individual were in an upright position.
". . .
"Q. Doctor, did you observe any other gunshot wounds to the deceased, Charles Franklin Simmons?
"A. Yes, I did.
"Q. Where was that?
"A. There was a distant gunshot wound which was located on the medial or inner aspect of the right elbow area which was in a location 16 and 1/2 inches from the end of the right hand. It was approximately 1 inch below the inner aspect of the right antecubital fossa area, which is the elbow region. That gunshot entrance wound track could be probed when the right forearm was located in a position according to the anatomic position about 10 degrees above the horizontal plane and the right hand was rotated medially 90 degrees. That gunshot entrance wound had a diameter of .23 inch and no powder stippling or soot or burns observed in or around the substance of that wound. There was a linear laceration or split which extended about the wound which had a diameter approximating .45 inch. This wound — apparently the projectile inflicting this wound passed in an upward angle approximating 65 degrees after penetrating the skin. After penetrating the skin this projectile struck the bone in the right elbow area and became lodged in the subcutaneous tissues in the right elbow area.
"Q. Doctor, are you saying that the projectile entered at an upward angle of 65 degrees?
"A. That's correct.
"Q. Are you saying that the arm had to be in this basic position for the projectile to enter at that angle, assuming the standard anatomical position except for the hand?
"MR. JAFFE: Leading and suggestive. Object.
"THE COURT: I'll overrule it.
"MR. JAFFE: We would ask that the jury disregard it.
"THE COURT: Overruled.
"Q. Are you saying the arm had to be extended up like this if the deceased was standing upright at the time the projectile struck the arm?
"A. It would be my opinion that according to the anatomical position the forearm would be elevated at this approximate location, that the right forearm area would be *Page 1033 
rotated 90 degrees, which would be this position.
"MR. JAFFE: We would further object and move to exclude that based on the fact that it assumes something not in evidence. It assumes anatomical position. It's a fact not in evidence. We object.
"THE COURT: Overruled.
"THE WITNESS: It would be my opinion that I could not determine the position of the upper arm. It would be the rotation of the forearm and the hand area that would allow probing of this wound. Any relative position that would allow this angle — it could be — the forearm could be extended forward. The forearm could be out to the side or it could be extended upward should the angle be downward. There would be several possibilities for the right arm but this unique orientation of the forearm.
"Q. If the body were laying in a prone position on it's back with the arms on the floor in this nature and someone fired downward when you measured that standard anatomical position you would get an upward angle, wouldn't you?
"MR. JAFFE: We object to that.
"THE COURT: Sustained.
"MR. JAFFE: We would ask the jury to disregard it.
"MR. NAIL: How else do you ask it?
"MR. JAFFE: It assumes a total hypothetical question.
"THE COURT: I'm going to sustain the objection to that one.
"Q. Let me ask you this: You say from the standard anatomical position it entered at an upward angle. Depending on the position of the body the bullet could have been fired in a downward angle but when you measured it in the standard anatomical position it would veer in an upward angle, wouldn't it?
"MR. JAFFE: I object to that. I don't understand the question.
"THE COURT: Overruled.
"MR. JAFFE: We except.
"A. That is correct.
". . .
"Q. Does that photograph truly and accurately depict the wound as you observed it back on September 2, 1981.
"A. Yes it does.
"MR. NAIL: We would offer State's Exhibit 47.
"MR. JAFFE: Same grounds as every other picture concerning his opinion as to the angle of some bullet he didn't see go in. I object.
"THE COURT: Overruled.
"(State's Exhibit 47 received into evidence.)
"THE COURT: I've got to ask a question. Doctor, that wound is right here. You always talk about this anatomical position when you stand up straight. Tell me what position the body would be in when that arrived — I assume, that someone is on a roof and it comes down at this angle?
"THE WITNESS: I think there would be several possible positions. I think that the head is mobile. I think that a wound such as this could be inflicted in the head where bent appreciably downward in the direction from which the shot were fired, assuming the shot was from that direction it could be appreciably bent over. I think if the deceased were in an upright position it could be fired from a position very much higher than the deceased. I think that an individual could be lying down and receive such a wound.
". . .
"Q. Doctor, I'll show you a photograph marked for identification State's Exhibit 48 and ask you to look at it and ask you if you recognize the scene in that photograph.
"A. Yes, sir, I do.
"Q. What is that, please, sir?
"A. This is a photograph of the lacerations which I previously described which were located approximately 1 inch behind the front midline hairline of the deceased.
"Q. Doctor, would that laceration be consistent with someone being struck in the *Page 1034 
head with the barrel of this rifle marked State's Exhibit No. 5 that's in evidence?
"A. Yes, it would.
"Q. From your examination can you determine whether someone could have been — this barrel could have caused that wound by someone striking the deceased from the rear or from the front?
"A. This wound had undermining that was directed toward the front of the decedent's head. In other words, the skin would peel toward the front of the decedent's head. There was a linear laceration associated with this wound which was present behind this semilunar or crescent shaped laceration. It would be my opinion that the direction of the force would be directed toward the front of the head of the latter linear laceration and that would be consistent with the site being directed posterior.
"MR. JAFFE: We move to exclude that. It's a hypothetical assuming about four different hypothetical conditions. I object to it.
"THE COURT: Overruled.
". . .
"Q. Could these gunshot wounds be consistent with the deceased being in a prone position lying down on the floor?
"MR. JAFFE: That's repetitious. We object. He said yesterday that there was a number of hypothetical positions, leaning forward and so forth. We object.
"THE COURT: Overruled.
"MR. JAFFE: We except.
"THE COURT: I gather this is in summary after the additional testimony.
"A. Those wounds would be consistent with wounds sustained from a prone position."
The above quoted colloquy clearly shows that the trial court allowed Dr. Brissie to give his opinion as to the various positions the deceased would have to be in to receive his wounds. This testimony was over objection of defense counsel.
The testimony clearly violates the rule stated for this court by Judge Bowen in Ivey v. State, 369 So.2d 1276
(Ala.Crim.App.), cert. denied, 369 So.2d 1281 (Ala. 1979). InIvey, Judge Bowen opined:
 ". . . [T]he rule stated in Crawford v. State, 262 Ala. 191, 192, 78 So.2d 291 (1955), and Padgett v. State, 49 Ala. App. 130, 136, 269 So.2d 147, cert. denied, 289 Ala. 749, 269 So.2d 154 (1972)" indicates:
 "This rule states that in a murder prosecution it is not permissible for a witness, including a medical expert, to draw conclusions for the jury as to the relative positions of the parties at the time of the shooting from a mere examination of the wounds. It is not competent for a witness, expert or nonexpert, to draw inferences for the jury from the slant or angle of the wound as to the relative positions of the combatants when the fatal shot was fired. `This would be invasive of the province of the jury and a matter of which they would be quite as competent to judge as the witness, having been given a description of the wound.' Mathis v. State, 15 Ala. App. 245, 248, 73 So. 122, 124 (1916)." See also, Wilson v. State, 430 So.2d 891
(Ala.Crim.App. 1983).
It was further stated in Padgett, supra, that "[i]n dealing with the question of possible prejudice, it is wise to be mindful of what our Supreme Court said, per Goodwyn, J., inBoggs v. State, 268 Ala. 358, 106 So.2d 263:
`We have examined the entire record and are not
 satisfied that the admission of such evidence was without injury to substantial rights of appellant. He was charged with and found guilty of murder in the first degree; and we think the evidence clearly supports such finding. But, in so finding, it was within the sole discretion of the jury to prescribe as punishment either the death penalty or imprisonment in the penitentiary for life. Code 1940, Tit. 14, § 318. We cannot possibly probe into the mental processes of the jurors to ascertain whether and to what extent incompetent testimony actually had in influencing the exercise of their discretion in fixing the punishment. *Page 1035 
We are not willing to say it did not have some influence on them, thus affecting the substantial rights of appellant.'"
Padgett, supra, 49 Ala. App. at 137, 269 So.2d 147.
In positioning the body of the deceased, Dr. Brissie in effect testified to the relative positions of the parties at the time the wounds were inflicted. Such an inference was invasive of the province of the jury and injurious to the substantial rights of the appellant. This cause is due to be reversed on these grounds.
Appellant's other issues have been pretermitted from consideration as they are not likely to happen again on retrial of this cause.
REVERSED AND REMANDED FOR NEW TRIAL.
All the Judges concur.