LEIGH M. CLARK, Retired Circuit Judge.
This appellant was found guilty by a jury on a trial on an indictment charging him with the murder of Deborah Turner Ches-ser “in violation of § 13A-6-2 of the Code of Alabama 1975, as amended,” which sets out the crime of murder. The victim was the wife of the defendant. According to the undisputed evidence, she was killed by two bullets fired on the same occasion from a pistol while she and the defendant were in their own home and no one else was present. We will limit our recital of the facts as found in the transcript of the evidence to those that are pertinent to the only issue presented in the brief of counsel for appellant, as follows:

“Did the Trial Court err in allowing witness Lonnie Harden to demonstrate to the jury the manner in which the weapon would have to be held to cause the gunshot to the head of Deborah Chesser?

According to the testimony of the defendant, the victim had engaged in a “big argument” which she commenced about two days before her death, as to which he endeavored to give her the “silent treatment.” They had been to his parents’ home for a Sunday dinner, and had returned to their own home and drunk some beer and he had fallen asleep. We quote some of his testimony as to what occurred when he “waked up”:
“A. Debra was drunk when I woke up and she also had her diploma out laying on the coffee table and had some cocaine laying on the diploma with a straw and was snorting cocaine when I woke up.
[[Image here]]
“Q. This was about what time?
“A. Probably around 8:00 [P.M.].
“Q. What happened after that, Tony?
“A. Arguing and arguing — nothing much. I told her that I was just about — you know — I didn’t want to hear it. I didn’t say a whole lot about it. We gave each other the silent treatment, as I say.
“Q. What were you doing there in the living room at that time?
“A. Watching the TV.
“Q. All right. Did you have any other visitors that evening?
“A. Yes, I did.
“Q. Who was that?
“A. That was my brother. He comes home on the weekends from Atlanta. He works in Atlanta.
[[Image here]]
“Q. Then how long did he stay?
“A. Maybe half an hour. He didn’t stay long because he had to get on back. He was late anyway. That is the reason I know it was about 12.
[[Image here]]
“A. 12:30. I went to bed when he left.
[[Image here]]
*632 “Q. What did Debra do?
“A. She stayed there watching TV and I guess she continued to drink. I was in bed.
“Q. You really don’t know what she did?
“A. No, I don’t.
“Q. Were you awakened?
“A. Yes, I was.
“Q. What awakened you?
“A. Her snatching the cover off of me, raising cane and cussing and hollering and fighting. So, I got up.
“Q. Wait just a minute. Tell the Court and jury about what time that was.
“A. Around 3:00.
[[Image here]]
“Q. Tell the court what happened at that point.
“A. I got up out of bed and started to put my clothes on and she was cussing and hollering that she was going to kill me, which I didn’t think too much about the threats until she reached under the mattress and pulled the gun out. Well, it scared me and she pointed the gun at me and told me she was fixing to kill me. So I ran down into the kitchen. There was a telephone in the kitchen.
[[Image here]]
“Q. Was she intoxicated at this time?
“A. At this time?
“Q. Yes.
“A. Sure, she was.
“Q. You were trying to call your folks in the kitchen?
“A. That’s right.
“Q. Go ahead and tell what happened?
“A. Well, she ran in there and started to pointing the gun at me and she knocked the telephone out of my hand and pointed the gun at me again. So I ran downstairs going toward the glass sliding door downstairs which I thought was usually open— unlocked.
“Q. What did you intend to do down there?
“A. I intended to leave, get out of there. I was just going to get out of the way and maybe — usually she would calm down and everything would be all right the next day. It had happened so many times before, not necessarily with a gun but just fighting.
“Q. Did Deborah have more of a temper when she was drinking than when she was sober?
“A. Yes, she sure did.
“Q. Were most of the arguments and problems you were having in your married life a result of her drinking?
“A. Yes.
[[Image here]]
“A. I went downstairs into the den. I was trying to get — I was going out the glass sliding door. She come through the doorway and shoots one time. I heard a ‘bam’ and saw the flash. The first thing I thought to do was to get out of the way— to get over there — so I got over there to her and we started fighting over the gun.
“Q. Where were you when you first saw the flash?
“A. I was at the glass sliding door.
“Q. You were standing near that door?
“A. Yes, sir.
“Q. Was there anything between you and her?
“A. Yes, a table and 4 chairs.
“Q. And after you saw and heard the first blast, tell the Court and jury what you did?
“A. I ran towards her so I wouldn’t get shot and we started fighting over the gun and wrestling around. We must have went around the table 2 or 3 times. One time we could have been on the floor. I don’t know. We were just all over everywhere. I was just, you know, trying to stop this.
“Q. Was she still yelling?
“A. Yes, and cussing and threatening— you know — telling me what she was going to do and all of that. So at that time we run around the table a couple of times and the gun went off and I didn’t know if anyone was shot or if the shot went in the floor or what. She told me, T am shot, you *633 son-of-a-bitch, and now I’m going to kill you,’ and pointed it in my face. When she done that — when she pointed it in my face — I grabbed the gun and the gun went off again. We were turning the whole time — twisting and turning and the gun went off again and she fell down. I knew that something was wrong. So I ran and cut the light on. I went over there to her and I was shaking her. I said, ‘Debra.’ I was trying to wake her up and I couldn’t wake her up and I saw blood on her. I got a white smock that was laying on either the chair or on the table or wherever it was and I tried to wipe the blood from her. I was shaking her and I was trying to see whether her heart was beating or whether she was breathing or anything and I realized she wasn’t. I couldn’t wake her up. Then I needed some help, so I run back upstairs and out the door and I got in my car and I was going to my Dad’s house for help. I needed some help and that’s all I could think of was that I needed some help. Something was wrong.
“Q. So, you drove to Columbus, Georgia?
“A. Yes, sir.
“Q. That’s when the police officer got in behind you?
“A. Yes, sir.
“Q. Tell the court and jury what happened when he got in behind you?
“A. I didn’t stop. I put my flashers and I I just kept going. I went on to my Dad’s trying to get some help and he pulled in behind me. I got out of the car and I was trying to tell him that we needed some help — you know — I needed some help.
“Q. Were you upset at that time?
“A. Sure, I was.
“Q. You have been described by witnesses as disturbed.
"A. I couldn’t think; I was almost out of my mind.
“Q. And you got to your father’s home and there was a series of communications, were there not, with the police officer?
“A. Yes, sir. We went in the house and I said, ‘Let’s go back over there.’ I said, ‘I think she is dead.’ She wasn’t breathing and I was trying to explain to them. I don’t know exactly what I said. So, he puts me in the police car and transports me to the 14th Street Bridge to another police car and he won’t let me go home to go see about my wife or anything. He wouldn’t give me the information on her. He takes me down to the police station and the next thing I know I’m booked and they put me in jail.
[[Image here]]
“Q. You are here today charged with murder?
“A. That’s right, yes, sir.
“Q. Tony, the jury has to decide and I want you to testify as to whether or not you deliberately killed Debra Chesser.
“A. No way did I kill my wife. I loved my wife. I sure did. I did not kill Debra Chesser.
“Q. Mr. Davis is going to ask you some questions.”
At this point in the transcript, the prosecuting attorney commenced cross-examination of the defendant that constituted about twenty-five pages of the transcript. We believe it is sufficient for us to quote approximately one page of the commencement and approximately a page of the conclusion of his testimony on cross-examination. We now give the first part:
“Q. How old are you, Mr. Chesser?
“A. I am 25 years old.
“Q. How old was your wife at her death?
“A. She was 23 years old.
“Q. You and she had been married twice?
“A. Yes, sir, that’s right.
“Q. How long was the first marriage? “A. About 5 months.
"Q. Would you say it was a trouble-plagued marriage?
“A. Excuse me, I didn’t understand.
“Q. Would say it was a trouble-plagued marriage?
“A. The first one you are saying?
“Q. Yes.
*634 “A. Yes.
“Q. Those troubles, were they related to accusations by your wife that you were seeing other women and running around and that kind of thing?
“A. Yes, sir, the first one.
“Q. In fact, that marriage ended when your wife found you in bed with another woman in your own home? Is that correct?
“MR. PAULK: We object to that, may it please the Court.
“Q. Isn't that true, Mr. Chesser?
“A. No, it is not true.
[[Image here]]
“Q. Two nights prior to the death of Debra Chesser where had you slept, Mr. Chesser?
“A. Two nights prior to the death of my wife?
“Q. Yes.
“A. I slept at home.
“Q. At your home on 7th Avenue?
“A. Yes, sir.”
During the latter part of the testimony of defendant on cross-examination, is the following:
“Q. Mr. Chesser, the fact of the matter is that on the night of 23rd of January and the early morning hours of the 24th of January you fired two bullets from that weapon into the body of your wife because she was going to leave you for running around; is that true?
“A. That is wrong and I can prove it.
“Q. Not only that, you shot at her two additional times and missed?
“A. No, sir.
“Q. And you come before this jury with a preposterous story and ask them to believe that this woman shot herself to death twice?
“A. I divorced her before, Mr. Davis. Why should I want to shoot her?
“Q. If you were frightened that she was going to shoot you, Mr. Chesser, why didn’t you call the police?
“A. I was scared.”
In support of the issue raised by appellant, his counsel relies upon a long established rule of law in Alabama, commencing with Mathis v. State, 15 Ala.App. 245, 248, 73 So. 122, 124 (1916), and stated as recently as Wilson v. State, 430 So.2d 891 (Ala.Cr.App.1983), which rule is that it is not competent for a witness, expert or non-expert, to draw inferences for the jury from the slant or angle of the wound as to the relative positions of the combatants when the fatal shot was fired. As was held in Mathis v. State, supra, “This would be invasive of the province of the jury and a matter which they would be quite as competent to judge as the witness, having been given a description of the wound.” Counsel for appellant argues that the testimony and the demonstration by the witness Lonnie Harden, like the testimony and demonstration of Dr. Embry in Wilson v. State, supra, violated the rule of law quoted above and “constitutes reversible error and mandates that the conviction in this case be set aside and reversed.”
By the brief of counsel for appellee, the position is taken that the present case is distinguishable from Wilson v. State, supra, Mathis v. State, supra, and any other authority relied upon by counsel for appellant in that in the case sub judice, the evidence complained of by the attorney for the appellant was “as to how the pistol would have been held by an individual in order for the wounds to have been self-inflicted.” To this contention, the attorney for appellant in a reply brief states that the attorney for appellee takes the position “that the semantics of the question asked in the instant case differs from that of Wilson and Mathis.” Our understanding of the contention made by counsel for appellant in his reply brief is to the effect that the particular argument of counsel for appellee is not applicable for the reason that no contention was made on behalf of the defendant on the trial of the case that the victim voluntarily exerted pressure upon the trigger of the pistol in such a way as to cause the discharge of the bullets that killed her. As to this, we are inclined to agree with counsel for appellant. However, on final analysis, we agree with coun *635 sel for appellee as to the only issue presented on appeal. We reach this conclusion for the reason that, notwithstanding the position of appellant that it was not contended by the defendant on the trial of the case that the victim voluntarily took her own life, the State was entitled to show, in an effort to convince each and every juror beyond a reasonable doubt and to a moral certainty that defendant had murdered his wife, that defendant’s wife did not voluntarily take her own life.
We are convinced that the only issue presented by appellant should be determined adversely to him and that the judg: ment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.