This is a death penalty case. This Court has held the proceedings in this case in abeyance since 1987 pending decisions of the United States Supreme Court that are dispositive of a vital issue to be decided by this Court. That issue is whether the imposition of capital punishment on an individual for a capital felony committed at 17 years of age constitutes cruel and unusual punishment under the Eighth Amendment.
The petitioner raised that issue, along with 14 others:
 "I. Did the trial judge err to reversal in denying Appellant's Motion for New Trial, as amended, on the grounds that the District Judge hearing the case both preliminarily and on the question of the Appellant's certification as an adult was the brother of Frank Teel who appeared in said proceedings as Assistant District Attorney?
 "II. Did the Circuit Judge err to reversal in denying the Appellant's Youthful Offender application based on his opinion that the Youthful Offender Statute was not applicable to capital felony cases and his assertion that the Court had conducted an independent investigation into the Youthful Offender application of the Appellant?
 "III. Did the trial judge err to reversal in allowing witnesses Veston Peters and James Boggs to testify about the conversation with the Appellant prior to the time that Appellant was given his Miranda rights?
 "IV. Did the trial judge err to reversal in denying Appellant's Motion to Suppress the introduction *Page 1113 
into evidence of the undershorts taken from the Appellant?
 "V. Did the Circuit Judge err to reversal in denying Appellant's Motion for Change of Venue?
 "VI. Did the trial court err to reversal in denying Appellant's Motion to Exclude the State's evidence, and did it err to reversal in allowing introduction of the motorcycle helmet and clothing of the Appellant?
 "VII. Did the trial court err to reversal in allowing witness Joe Neighbors, Jr., to describe a motorcycle he observed at the residence of the Appellant?
 "VIII. Did the trial court err to reversal in allowing witness Mortimer Thurman to testify about regulations of the Department of Corrections?
 "IX. Did the trial court err to reversal in allowing introduction of State's Exhibit Number 20, the Authorization for Autopsy?
 "X. Did the trial court err to reversal in allowing witnesses Lawdon Yates and W.H. Landrum to testify about blood samples and swabs taken from Mrs. Alford and in allowing evidence presented by Dr. Embry concerning the autopsy done on the body of Mrs. Alford?
 "XI. Is the Appellant entitled to a new trial because of the Preclusion Clause in Title 13-11-2(a)(2) of the Code of Alabama, 1975, at the time of his conviction for the capital offense?
 "XII. Did the trial court err to reversal in allowing introduction of the psychiatric report on the Appellant by the Lunacy Commission at the sentencing hearing and in denying the Appellant's Motion for Additional and Subsequent Evaluation of the Appellant in regard to the Psychiatric or Psychological evaluation for sentencing purposes?
 "XIII. Did the trial judge err to reversal in denying Appellant's request for disclosure of the State's witnesses' criminal record[s]?
 "XIV. Is the death penalty cruel and unusual punishment when applied to the Appellant who was a juvenile, seventeen (17) years of age, at the time of the offense and had no criminal history, and is the method of execution in the State of Alabama cruel and unusual punishment?
 "XV. Was it reversible error to allow Dr. Joseph Embry to testify as to the relative positions of the parties at the time of the stabbing from a mere examination of the wounds?"
We have searched the record for any plain error or defect in the proceedings at trial and have reviewed the opinions of the Court of Criminal Appeals as they relate to the issues enumerated above and the opinions of the United States Supreme Court in Baldwin v. Alabama, 472 U.S. 372, 105 S.Ct. 2727,86 L.Ed.2d 300 (1985); Hopper v. Evans, 456 U.S. 605,102 S.Ct. 2049, 72 L.Ed.2d 367 (1982); Beck v. Alabama, 447 U.S. 625,100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), on remand, 396 So.2d 645
(Ala. 1981); and Ritter v. State, 403 So.2d 154 (Ala. 1981). Having done so, we affirm the judgment of the Court of Criminal Appeals as to issues I through XI and issue XIII, leaving issues XII, XIV, and XV for discussion in this opinion. SeeDavis v. State, 554 So.2d 1094 (Ala.Crim.App. 1986).
 FACTS
We adopt in toto the facts of this case as found in the opinion of the Court of Criminal Appeals. Davis v. State,supra.
 ISSUE XIV
The United States Supreme Court has ruled that "imposition of capital punishment on any person who murders at 16 or 17 years of age does not offend the Eighth Amendment's prohibition against *Page 1114 
cruel and unusual punishment." Stanford v. Kentucky, ___ U.S. ___, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). The Supreme Court has stated that whether a particular punishment violates the Eighth Amendment depends on whether it constitutes one of "those modes or acts of punishment that had been considered cruel and unusual at the time the Bill of Rights was adopted."Ford v. Wainwright, 477 U.S. 399, 405, 106 S.Ct. 2595, 2599,91 L.Ed.2d 335 (1986). In Stanford and its companion case, neither petitioner asserted that his sentence constituted "one of those modes or acts of punishment that had been considered cruel and unusual at the time the Bill of Rights was adopted. . . . Nor could they support such a contention." Id., ___ U.S. ___,109 S.Ct. at 2974. The Supreme Court noted that at the time the Bill of Rights was adopted, "the common law set the rebuttable presumption of incapacity to commit any felony at the age of 14, and theoretically permitted capital punishment to be imposed on anyone over the age of 7," and further noted that "[i]n accordance with the standards of this common law tradition, at least 281 offenders under the age of 18 have been executed in this country, and at least 126 under the age of 17." ___ U.S. at ___, 109 S.Ct. at 2974. The Supreme Court said that the petitioners were, thus, left to argue that "their punishment is contrary to the evolving standards of decency that mark the progress of a maturing society." ___ U.S. at ___,109 S.Ct. at 2974, quoting Trop v. Dulles, 356 U.S. 86, 101,78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion). The Supreme Court concluded that the petitioners had failed to show a national pattern of federal and state laws proving a settled consensus against the execution of 16- and 17-year-old offenders. Therefore, we conclude that the imposition of capital punishment on the petitioner, Timothy Charles Davis, who was 17 years old at the time he sodomized and murdered his robbery victim, does not violate this state's constitutional prohibition against cruel and unusual punishment.
 ISSUE XV
The petitioner argues that the trial court erred in allowing the state's expert witness, Dr. Joseph Embry, a forensic pathologist, to testify as to the relative positions of the parties at the time the murder occurred. We disagree. The prosecutor asked Dr. Embry the following questions on direct examination concerning the wounds in the victim's back:
 "Q: I asked, whether or not [the wounds] would be consistent with a stabbing from someone who was behind her or squatting over her or straddling her waist?
"A: Yes it would.
 "Q: Doctor, were you able to determine whether or not it would be consistent given the nature of the wounds for a right handed person or a left handed person to inflict the wounds?
 "A: Well given the circumstance, that you just asked me, that it would be consistent was he straddling her and was he at her waist approximately, it could be done with either hand, it would be consistent with either hand."
On cross-examination, Dr. Embry testified in more detail about the relative positions of the parties. The prosecutor and Dr. Embry even demonstrated the relative positions of the parties during the questioning. Petitioner argues that this testimony and demonstration invaded the province of the jury and were injurious to his substantial rights, citing Smith v.State, 466 So.2d 1026 (Ala.Crim.App. 1985); Wilson v. State,430 So.2d 891 (Ala.Crim.App. 1983); and Ivey v. State,369 So.2d 1276 (Ala.Crim.App. 1979), cert. denied, 369 So.2d 1281
(Ala. 1979). Each of the cases cited by the petitioner involved a homicide by shooting, and in each case the defendant claimed accident or self-defense; the prejudicial error in each case occurred because the relative positions of the parties constituted a material inquiry of critical importance. In this case, the petitioner's defense at trial was an alibi: that he was not at the scene of the crime and that someone else must have robbed, sodomized, and murdered the victim. The testimony concerning *Page 1115 
the position of the assailant when he stabbed the victim in the back 17 times was not of critical importance to any issue at trial. We find a compelling distinction between the facts of those cases cited by petitioner and the facts and issues of this case; therefore, we hold that the trial court did not commit error injurious to the petitioner's substantial rights by allowing Dr. Embry to testify as to the relative positions of the parties.
 ISSUE XII
The petitioner argues that the trial court erred in allowing, at the sentencing hearing, the introduction of the psychiatric report on the petitioner that was prepared before the guilt phase of the trial by the Lunacy Commission at Bryce Hospital's Forensic Unit of the State of Alabama Department of Mental Health. The petitioner was committed to the state hospital for psychiatric examination under Code 1975, § 15-16-22, and he underwent physical, neurological, and psychological evaluations by qualified personnel. The report stated:
 "The psychological evaluation revealed Mr. Davis to be functioning at the average level of intellectual ability. Psychological tests are not suggestive of organic impairment. Tests results do not indicate a current thought disorder.
 "The neurological evaluations revealed a normal skull x-ray, normal electro-encephalogram, and normal neurological examination.
 "After careful study and evaluation of Timothy Davis, the Lunacy Commission's findings separately and collectively are as follows:
 "(1) Timothy Davis is presently competent to stand trial and to assist counsel in preparing his defense. Also, Mr. Davis does understand the nature of the charges against him.
 "(2) Timothy Davis was not suffering from a mental illness at the time of the acts charged which would have prevented him from distinguishing right from wrong.
 "(3) Timothy Davis was not suffering from a mental illness at the time of the acts charged which would have prevented him from adhering to the right."
The petitioner argues that the issues that were to be determined by the Lunacy Commission were not the same as those raised by Code 1975, § 13-11-7(2) and (6)[1] which concern mitigating circumstances.[2] Further, the petitioner claims that it was a denial of his due process rights and a violation of the sentencing procedure of the Code for the trial court to deny his motion for additional and subsequent psychological evaluation, citing Jacobs v. State, 361 So.2d 640 (Ala. 1978),cert. denied, 439 U.S. 1122, 99 S.Ct. 1034, 59 L.Ed.2d 83
(1979). The trial court found that there were no mitigating circumstances with regard to the petitioner's being under the influence of extreme mental or emotional disturbance or with regard to the petitioner's being unable to fully appreciate the criminality of his conduct. In its sentencing order, the trial court summarized the psychiatric report *Page 1116 
findings and the related evidence as follows:
 "The Court accepts the stipulations of the State and defendant that the defendant was 17 years of age and was married at the time the offense was committed, and that the defendant had no significant history of prior criminal activity.
 "In addition to the mitigating circumstances of age of the defendant and no significant history of prior criminal activity, the defendant presented to the Court that the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance, and that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. The defendant also raises the State's willingness to recommend life imprisonment without parole in exchange for a plea of guilty.
 "The Court finds that while the chronological age of the defendant was 17 at the time of the offense, his activities gave signs of young adulthood in several aspects. He had acquired a job at the Russell Mills Corporation Distribution Center where he accepted responsibility for the handling of cloth goods manufactured by that company. He purchased a motorcycle from a fellow employee and operated the vehicle on the public streets and highways. He had recently married Pamela Shaffer. He had held two other jobs prior to locating in Coosa County. His general appearance during the trial was somewhat typical of a nineteen year old man. He exhibited interest in the proceedings during the early days of the trial. He communicated freely with his counsel; however, as the trial proceeded, his interest seemed to diminish. He displayed little emotional reaction. The Court finds defendant's age is a mitigating circumstance.
 "The Court finds by stipulation of the parties that the defendant has no significant history of prior criminal activity and the Court considers this along with all the other enumerated mitigating circumstances.
 "The defendant presented to the Court that the capital felony was committed while the defendant was under the influence of extreme mental and emotional disturbance. The Court finds from the juvenile records of the Coosa County Juvenile Court that from July 20-21, 1978, and for some period of time thereafter, the defendant was under the supervision of Michael Smith, the Juvenile Probation Officer. This probation officer had opportunity to be with the defendant and the records reflect that his observation of the defendant's demeanor was that he was a controlled and talkative individual, that he exhibited basically even temperament with other juveniles and staff at the Coosa Valley Detention Center. He participated in group activities, although he seemed to prefer staying to himself. His behavior as to the extent and nature of his physical and mental maturity seemed to be typical of persons in his age group. He appeared to know right from wrong, and he appeared to understand the consequence facing him. He was in the lower normal range of intelligence and seemed to be normally developed physically for his sex and age. The report further reflects that the defendant did not appear to be physically or mentally deficient for his age. The Court does not find the existence of such mitigating circumstance.
 "Next, the defendant states to the Court that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. The Court finds from the mental and psychological examinations, that were given at the Forensic Unit of the Bryce Hospital during the months of May and June, 1979, when the defendant was ordered there by the Circuit Court for the purpose of an evaluation, that the following reports reflect the medical opinions of those persons who conducted the examinations at Bryce Hospital. Doctor Thomas Smith, a Psychiatrist, states in his report that the defendant's judgment and insight are fair, that his *Page 1117 
memory is fair, calculations are fair and general information store is within expected range. Doctor Smith's further impression was that the defendant was a reactive depression neurotic.
 "Doctor Thompson says in his report and evaluation that he cannot see the defendant as being schizoid or withdrawn. He could not see any evidence at that time of any possible amnesia or fugue states. He said further that he thought the defendant was competent, and that he was competent at the time of his charges. He further said that he, as far as his diagnosis was concerned, thought that the defendant was unstable and immature.
 "The examination of the defendant by a psychologist with the aid of certain psychological tests was the basis for the report signed by Patricia Anne Larkin, a Psychologist, and approved by Dr. Seger, also a Psychologist. She states in her report that Mr. Davis was an alert, oriented, cooperative adolescent who, despite his emotional ability, was able to attend to test tasks and had no difficulties in understanding and following directions. That he had a Full Scale IQ of 88, and that from all the findings from the battery of tests performed with him and by him, he was considered within the average range of persons his age.
 "Next, the report of Dr. Nagi, found that the defendant was functioning intellectually within the average range. That his abstract thinking was okay. His memory recall and retention were not impaired. He was oriented as to time, person and place. And his fund of general knowledge was average. He was defensive, anxious, slightly depressed, but his judgment and insight were fair. He further said that Mr. Davis does not seem to be suffering from mental illness, and was in his right mind at the time the crime was committed. The Court does not find that this mitigating circumstance exists.
 "The defendant also raises the State's willingness during the trial to recommend to the Court life imprisonment without parole in exchange for a plea of guilty.
 "The Court finds that such discussions did take place between the State and defendant's counsel. Initially the discussions were had after the high mark of the State's case was reached by the admission of a series of evidence placing the defendant at the scene of the crime when the crime was committed. Defendant's counsel approached the State [and] brought forward an offer to plead the defendant guilty. They asked the State of talk to the victim's family. They did. The response of the family, principally, two adult [sisters], was that they would not object if it meant the trial would stop thereby avoiding further trauma associated with the heinousness of the crime. When this was communicated to the defendant and some members of his family, the defendant was not willing to enter a plea. The trial proceeded with the jury having no awareness of these discussions. The Court did not actively participate in the negotiations.
 "This Court recognizes that defendant's counsel felt a duty to enter into such a plea discussion as part of a competent representation of their client. This Court also recognizes that it had no obligation to be bound by such a recommendation if it had in fact been made. The Court does not find this a mitigating circumstance.
 "The Court considered then as it does now that it is the sole responsibility of the Court to determine from all the matters that may be duly considered whether the defendant's punishment shall be life imprisonment without parole or the death penalty.
 "The State presents to the Court the aggravating circumstance that the capital felony was especially heinous, atrocious or cruel. The Court finds that the commission of the crime of robbery by the defendant on the victim coupled with the intentional killing of the victim during the course of the robbery by stabbing her 17 times as she lay face down on the floor of her store, and that such *Page 1118 
stabbing occurred during or just after the defendant had committed the act of sodomy on the victim is especially heinous, atrocious or cruel.
 "This Court recognizes that the jury verdict in this case is essentially the pronouncement of the defendant's guilt based upon the trial evidence. The Court does not in any manner whatsoever consider that the verdict or its language is demand to the Court for the imposition of the death penalty but to the contrary, it is this Court and not the jury that must hear, consider and find mitigating and aggravating circumstances and make the final determination at the trial Court level as to the imposition of the death penalty or life imprisonment without parole."
At the sentencing phase of the trial, the petitioner argued to the trial court that he should be provided additional psychiatric or psychological examination to determine if two mitigating circumstances existed, specifically, whether he committed the capital felony while "under the influence of extreme mental or emotional disturbance" (Code 1975, § 13-11-7(2)), and whether his capacity to "appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired" (Code 1975, § 13-11-7(6)). We cannot agree that the petitioner was entitled to further psychiatric/psychological examination at the state's expense for sentencing purposes. First, the petitioner never raised an insanity defense at trial. As the United States Supreme Court stated in Ake v. Oklahoma, 470 U.S. 68, 82, 83,105 S.Ct. 1087, 1095, 1096, 84 L.Ed.2d 53 (1985):
 "A defendant's mental condition is not necessarily at issue in every criminal proceeding, however, and it is unlikely that psychiatric assistance would be of probable value in cases where it is not. The risk of error from denial of such assistance, as well as its probable value, is most predictably at its height when the defendant's mental condition is seriously in question. When the defendant is able to make an ex parte threshold showing to the trial court that his sanity is likely to be a significant factor in his defense, the need for the assistance of a psychiatrist is readily apparent."
We have no evidence that the petitioner's mental condition was seriously in question, either at the guilt phase of the trial or at the sentencing phase of the trial. Second, the petitioner had previously undergone thorough psychiatric and psychological testing by qualified doctors at Bryce Hospital, the state mental health hospital. The results of those tests and examinations revealed no evidence, of any nature, that the petitioner was under the influence of a mental or emotional infirmity at the time he committed the capital felony that would be relevant to the mitigating circumstances in Code 1975, §§ 13-11-7(2) and (6). If we found any evidence in the pretrial psychiatric/psychological reports that might have some doubt on the petitioner's sanity at the time he committed the capital felony, then a further examination would be necessary in this case to insure the petitioner's due process rights. However, the Lunacy Commission's report, supra, does not raise that doubt. We conclude that the trial court did not err in denying the petitioner's motion for additional and subsequent evaluation.
We also reject the petitioner's argument that his evaluation and testing was tainted by the participation of Edwin Seger, whose involvement was apparently limited to approval of a psychological report prepared by a qualified state psychologist at Bryce Hospital.[3] Because Mr. Seger's involvement was not crucial to the substantive evaluations and examinations and because there were several qualified doctors actively involved in the testing, supervision, and reporting of the results of the examinations of the petitioner, we conclude that Mr. Seger's involvement was not injurious to the petitioner's substantial rights. Therefore, we hold that the trial court did not err by allowing the psychiatric/psychological reports to be introduced at the sentencing hearing and that the trial court *Page 1119 
properly considered all of the evidence when weighing the aggravating and mitigating circumstances.
We have reviewed the record of all the proceedings below, and we conclude that the judgment of the Court of Criminal Appeals affirming the petitioner's conviction and sentence of death is due to be, and it is hereby, affirmed.
AFFIRMED.
HORNSBY, C.J., and MADDOX, JONES, SHORES, ADAMS, HOUSTON and STEAGALL, JJ., concur.
[1] Code 1975, § 13-11-7 was transferred to Code 1975, § 13A-5-36. Code 1975, § 13A-5-36, was repealed by Acts 1981, No. 81-178, § 20, effective July 1, 1981. Acts 1981, No. 81-178, p. 203, § 20, provides that the repeal of §§ 13A-5-30 through 13A-5-38 shall not affect the application of pre-existing law to conduct occurring before 12:01 a.m. on July 1, 1981.
[2] Code 1975, § 13-11-7, provides the following "mitigating circumstances":
 "(1) The defendant has no significant history of prior criminal activity;
 "(2) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance;
 "(3) The victim was a participant in the defendant's conduct or consented to the act;
 "(4) The defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor;
 "(5) The defendant acted under extreme duress or under the substantial domination of another person;
 "(6) The capacity of the defendant to appreciate the criminality of his conduct or to conform to the requirements of law was substantially impaired; and
"(7) The age of the defendant at the time of the crime."
[3] After the psychiatric/psychological tests were completed and reported, it was discovered that Edwin Seger had falsified his credentials as a psychologist, and he was discharged from employment with Bryce Hospital.