The defendant was indicted and convicted for the murder of his twenty month old stepson, James Allen Weaver, Jr., "by hitting or kicking him with his hand or foot." Alabama Code Section 13A-6-2 (1975). Sentence was life imprisonment. Three issues are raised on appeal.
 I
The defendant argues that his confession was inadmissible because he was denied the effective assistance of counsel in that counsel failed to give him "even the most rudimentary legal advice."
After the defendant had choked, assaulted and abused his stepson on the morning of August 24, 1981, he telephoned his wife at work. She returned home and an ambulance was called. The child died later that day on the operating table at Jackson Hospital.
On August 28th, the day after the funeral, Montgomery Police Officer Jerry Vaillancourt went to the defendant's residence and informed the defendant and his wife, Mrs. Gayle Phelps, that he needed to talk with them at police headquarters. The Phelpses agreed to meet with Officer Vaillancourt at his office.
After the officer left, Mrs. Phelps telephoned Attorney Edward Parker who was representing both her and the defendant in regaining the custody of Mrs. Phelps' daughter, Kristie. The Department of Pensions and Security had removed Kristie from their custody, apparently because the defendant had dislocated her hip "by yanking the child in the car." When Jamie was killed, Kristie was in the hospital recovering.
The defendant and his wife arrived at police headquarters but were not questioned because they were waiting on their attorney. Attorney Parker arrived around 8:30 a.m. Officer Vaillancourt then advised the defendant and Mrs. Phelps of their Miranda rights[1] in the presence of the attorney. The defendant and his wife executed written waivers at 8:47 a.m.
Only then did Vaillancourt inform them that "this was a homicide investigation." At that point, Parker "stopped everything" and talked privately with the police. After Vaillancourt told Parker why he wanted the statements, Parker said that he was representing both the defendant and his wife and they would not make a statement.
Parker called another member of his law firm, Sterling Culpepper. The two attorneys decided that they needed to discuss the matter before agreeing to represent both the defendant and his wife in this criminal matter. Parker told the police that he "didn't know if we're going to represent them at all on any criminal charges" and that he needed to "discuss this with Sterling Culpepper because he has experience in these matters."
Parker told the defendant and his wife that they were "being investigated with the most serious of offenses" and that they needed to discuss the matter. "With that understanding", the police let the defendant and his wife go with Parker to his office.
The defendant testified that, when Parker returned from talking with the police, Parker said that "they were gonna make an arrest if one of you didn't confess." Parker denied making such a statement[2].
Since Parker had never practiced criminal law, he told Culpepper that he "would rather not represent either one of them." Culpepper had represented Mrs. Phelps "on the divorce matter" and in "this custody fight" *Page 161 
and felt that they needed to talk to Mrs. Phelps before making any decision.
After both attorneys had discussed the infant's death with Mrs. Phelps, they determined that they could only represent her in the criminal matter. They decided that they could not represent both her and the defendant. Parker testified that to represent the defendant also would constitute "a definite conflict of interest. That they were just diametrically opposed, there would be no way possible."
Culpepper's secretary had been talking with the defendant and his wife while they were waiting on the attorneys. Before the attorneys told the defendant that they could not represent him, the secretary told the attorneys that the defendant had stated that he wanted to confess. After the attorneys told the defendant that they could not represent him, the defendant again stated that he wanted to make a statement. Parker testified:
 "We then walked into the conference room without Gayle, Sterling and myself, Sterling speaking. Sterling said: We do not represent you, David. We cannot represent you on any criminal charges that might be brought. We can only represent Gayle. Your interests are diametrically opposed. There's a conflict here. We don't give you any advice whatsoever except to tell you that you should, indeed, get representation and employ an attorney. He then, very softly, said: Well, I would like to say — He didn't say confess, I don't believe. He said I would like to say I did it — or something to that effect. Sterling responded and said: Well, I don't give you any advice to do that one way or the other, but as a citizen I feel that you are doing the right thing. Then he asked to be allowed to make a confession to the police and we said, you know you need an attorney and he said well, call the policeman for me, but I prefer that you have plain-clothesmen — the detectives we had seen earlier that day. We called them. They came and picked David up."
Officer Vaillancourt picked up the defendant at the lawyer's office and took him to police headquarters. The defendant was readvised of his Miranda rights and signed a written waiver at 11:10 a.m.
In his statement, the defendant admitted hitting, choking and almost drowning Jamie on the morning of the day the infant was killed.
At the hearing on the motion to suppress the confession, the trial judge framed the specific issue: "The question is did the lawyer collaborate with the police in order to somehow force him into giving a statement?" On appeal, the defendant acknowledges that "there is no evidence that the detectives were part and parcel of the eventual decision made by the defendant." However, he argues that it is "painfully apparent" that the lawyers "sacrificed" their former client "so that the client they elected to continue to represent might remain free." The defendant contends that his attorneys were ethically bound to "strongly advise if not practically insist" that it would be against his interests to make a confession.
The record is clear, and there is no assertion to the contrary, that the defendant was given all the warnings required by Miranda, supra. It is also clear and uncontradicted that the defendant never invoked his right to counsel.
Erroneous, incomplete, or poor advice or consultation regarding an accused's pretrial silence may demonstrate and support a finding of inadequate assistance of counsel. Annot. 7 A.L.R.4th 180, Section 20 (1981). However, the mere fact that counsel advises the accused to make a statement to the police does not constitute inadequate representation as a matter of law. See 7 A.L.R.4th at Section 19.
The fact that a police officer tells the accused that it would be better to make a statement or to tell the truth does not constitute an improper inducement. Eakes v. State,387 So.2d 855 (Ala.Cr.App. 1978); Bennett v. State, 409 So.2d 936
(Ala.Cr.App. 1981). Attorney Culpepper did tell the defendant *Page 162 
that he felt as a citizen the defendant was doing the right thing. He said this after the defendant had already decided to make a statement. Other than the statement itself, there was no evidence that Culpepper's remark induced or contributed to inducing the defendant's confession. There was no evidence that the defendant relied upon Culpepper's personal opinion indeciding to confess.
This remark must also be considered in context. Along with this remark Culpepper also told the defendant that he could not represent him, that he could not give him any legal advice, and that he needed an attorney. After Culpepper told the defendant that he could neither represent him nor give him any legal advice, he advised the defendant that he needed a lawyer in direct response to the defendant's remark that he was going to make a statement. In view of these circumstances, we do not think that Culpepper's failure to further inform the defendant that he should or should not make any statement constitutes ineffective assistance of counsel. "Accused is entitled to counsel to aid him in his defense, but not to prevent voluntary action on his part." 23 C.J.S. Criminal Law, Section 979 (6) (1961).
Since the evidence defeats any claim of complicity between the attorneys and the police, no legitimate contention can be advanced that the attorneys were acting as agents for the police in inducing a confession from the defendant. Again, we emphasize that, when the defendant told the attorneys that he wanted to make a statement, they told him that he needed an attorney. If the defendant had relied upon the advice of the attorneys he would have consulted a lawyer before making a statement. This offers further support for the finding that the defendant's decision to confess was an independent and voluntary decision.
The defendant testified that he decided to confess in order to keep his wife from going to jail after Parker told them that they both would go to jail unless one of them confessed. Since Parker denied making that remark, the issue hinged on the credibility of the witnesses which was for the trial judge.Morgan v. State, 363 So.2d 1013, 1015 (Ala.Cr.App. 1978). "(U)nder a totality of the circumstances approach, an accused's subsequent account of his prior subjective mental impressions cannot be considered the sole determinative factor." UnitedStates v. Robertson, 582 F.2d 1356 (5th Cir. 1978).
The fact that the defendant confessed to save his wife from going to jail does not render the confession involuntary. "It is reasonable to assume that the cooperation of an arrested person often is prompted by a desire for leniency for himself or others. Statements or confessions made in such circumstances, if they are voluntary and made with full awareness of the person's rights, are reliable, probative and constitutionally admissible evidence." Robertson, 582 F.2d at 1368. "A statement made in supposed return for a benefit is not automatically involuntary. Each case turns on an assessment of the peculiar circumstances of the case." United States v.Jackson, 627 F.2d 1198, 1211 (D.C. Cir. 1980).
Although the defendant argues that counsel should have informed him of the consequences of making a confession, that is one of the functions of the Miranda warnings. "The Miranda
warnings are given not solely to make the suspect aware of the privilege, but also of the consequences of foregoing the privilege." United States v. McCrary, 643 F.2d 323, 329 (5th Cir. 1981). "Miranda implicitly assumes that it is possible for the police to convey to the accused sufficient understanding of his rights to enable him to make an intelligent waiver. . . . But irrespective of who gives the warnings or takes the confessions, the ultimate question is whether the waiver is voluntary in the full sense of the word." Frazier v. UnitedStates, 419 F.2d 1161, 1166, n. 24 (D.C. Cir. 1969).
The trial judge's finding that the defendant's confession was voluntary is supported by the defendant's own testimony. On cross examination, when asked why he went *Page 163 
to police headquarters and told the police he "did all these things", the defendant stated:
 "Because I did it. They were talking about arresting both of us, and Gayle had nothing to do with it. I didn't want them to come and arrest her, so I figured that, you know — I mean, I couldn't live with something like that forever even if nobody had ever found out the real reason, what really happened to him. I couldn't live with that."
 II
Not only did the defendant admit abusing the infant on the day of his death, but his confession also contained an account of how he had physically abused Jamie on prior occasions extending for the past "several months". In his statement, the defendant also admitted to abusing his stepdaughter.
At trial, the entire confession was properly admitted over the objection that it contained evidence of distinct and independent offenses. In a prosecution for murder, evidence of recent abuse to the child by the accused is admissible to show "intent, motive or scienter." Layne v. State, 54 Ala. App. 529,534, 310 So.2d 249 (1975). Acts of hostility, cruelty and abuse by the accused toward his homicide victim may be proved by the State for the purpose of showing motive and intent. Akers v.State, 399 So.2d 929, 931 (Ala.Cr.App. 1981); White v. State,380 So.2d 348, 349 (Ala.Cr.App. 1980); Carroll v. State,370 So.2d 749, 759 (Ala.Cr.App.), cert. denied, 370 So.2d 761 (Ala. 1979). This is "another of the primary exceptions to the general rule excluding evidence of other crimes." C. Gamble,McElroy's Alabama Evidence, Sections 70.01 (12)(c) and (e) (3rd ed. 1977).
Evidence of the defendant's recent abuse of his stepdaughter was also properly admitted despite the general rule that evidence of the accused's acts of hostility toward a third person in no way connected with the deceased or the offense is inadmissible. Voudrie v. State, 387 So.2d 248 (Ala.Cr.App.), cert. denied, Ex parte Voudrie, 387 So.2d 256 (Ala. 1980). "However, where their connection with the offense sufficiently appears, evidence of prior difficulties between accused and a third person is admissible to show malice, premeditation, or general state of mind, as is evidence of accused's ill will toward a member of the family of deceased." 40 C.J.S. Homicide, Section 209 (1944).
The appellate courts of this state have long recognized this rule especially where the victim and the deceased are closely related. Gregg v. State, 106 Ala. 44, 48, 17 So. 321 (1895);Shikles v. State, 31 Ala. App. 423, 428, 18 So.2d 412, cert. denied, 245 Ala. 641, 18 So.2d 417 (1944); Roberts v. State,25 Ala. App. 477, 479-80, 149 So. 356 (1933); Lewis v. State,13 Ala. App. 31, 34-5, 68 So. 792, cert. denied, Ex parte Lewis,193 Ala. 677, 69 So. 1018 (1915). Evidence of the defendant's abuse of his stepdaughter was admissible in this case for the murder of his stepson just as in a prosecution of a father for the carnal abuse of one daughter, testimony of four other daughters as to the father's lewd and sexual conduct toward them is competent and admissible. Lee v. State, 246 Ala. 69,72, 18 So.2d 706 (1944).
 III
The trial judge instructed the jury on the offenses of murder and manslaughter but refused to charge on criminally negligent homicide. The defendant argues that this refusal was error because the evidence afforded a rational basis for a conviction of the lesser included offense of criminally negligent homicide. We disagree.
The "safer" practice is to charge upon all degrees of homicide: "(I)t is much the safer rule to charge upon all the degrees of homicide included in the indictment, when a party is on trial for murder, unless it is perfectly clear to the judicial mind that there is no evidence tending to bring the offense within some particular degree." Pierson v. State,99 Ala. 148, 153, 13 So. 550 (1892), approved in Williams v.State, 251 Ala. 397, 399, 39 So.2d 37 (1948).
The controlling principles were stated by our Supreme Court in Chavers v. State, 361 So.2d 1106, 1107 (Ala. 1978): *Page 164 
 "An individual accused of the greater offense has a right to have the court charge on the lesser offenses included in the indictment, when there is a reasonable theory from the evidence supporting his position. Fulghum v. State, 291 Ala. 71, 277 So.2d 886 (1973). A court may properly refuse to charge on lesser included offenses only (1) when it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense, or (2) when the requested charge would have a tendency to mislead or confuse the jury. Lami v. State, 43 Ala. App. 108, 180 So.2d 279 (1965). In fact, our decisions are to the effect that every accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however, weak, insufficient, or doubtful in credibility. Burns v. State, 229 Ala. 68, 155 So. 561
(1934)."
"(D)ue process requires that a lesser included offense instruction be given only when the evidence warrants such an instruction." Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049,72 L.Ed.2d 367 (1982). "Under Alabama law, the rule in non-capital cases is that a lesser included offense instruction should be given if `there is any reasonable theory from the evidence which would support the position.'" Hopper, citing Fulghum, supra. By statute, "(t)he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." Alabama Code Section 13A-1-9 (b) (1975).
Alabama's new criminal code divides homicide into the crimes of murder (Section 13A-6-2), manslaughter (Section 13A-6-3), and criminally negligent homicide (Section 13A-6-4). These offenses replace the old crimes of murder and manslaughter in the first and second degrees.
By statutory definition, a person commits the crime of manslaughter if he recklessly causes the death of another person. Section 13A-6-3 (a)(1). The reckless offender is aware of a substantial and unjustifiable risk and "consciously disregards" it. Section 13A-2-2 (3); commentary to Section13A-2-2.
"A person commits the crime of criminally negligent homicide if he causes the death of another person by criminal negligence." Section 13A-6-4. "A person acts with criminal negligence . . . when he fails to perceive a substantial and unjustifiable risk that the result will occur. . . ." Section13A-2-2 (4). In both manslaughter and criminally negligent homicide "(t)he risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation." Sections 13A-2-2 (3) and (4).
The only difference between manslaughter under Section13A-6-3 (a)(1) and criminally negligent homicide is the difference between recklessness and criminal negligence. "The reckless offender is aware of the risk and `consciously disregards' it. On the other hand, the criminally negligent offender is not aware of the risk created (`fails to perceive') and, therefore, cannot be guilty of consciously disregarding it." Commentary to Section 13A-2-2. "The difference between the terms `recklessly' and `negligently', . . . is one of kind, rather than degree. Each actor creates a risk of harm. The reckless actor is aware of the risk and disregards it; the negligent actor is not aware of the risk but should have been aware of it." C. Torcia, 1 Wharton's Criminal Law Section 27 (14th ed. 1978) (emphasis in original).
Negligence "is distinguished from acting purposefully, knowingly, or recklessly in that it does not involve a state of awareness. It is the case where the actor creates inadvertently
a risk of which he ought to be aware, considering its nature and degree, the nature and the purpose of his conduct and the care that would be exercised by a reasonable person in his situation." Commentary to Section 13A-6-4.
The evidence shows that twenty-month old James Allen Weaver, Jr. had been physically and verbally abused for the last six months of his life. During this time, the *Page 165 
infant had been burned, beaten with a closed fist, kicked, choked, thrown across a room, and almost drowned. The actual cause of death was a very sharp and forceful blow to the infant's abdomen which lacerated his stomach and tore some of his internal organs. The blow was comparable to a fall "from a great height such as a second story window" with the infant landing on a "blunt but relatively concentrated object" such as the end of a broomstick or a baseball bat.
The defendant's brother-in-law testified that the defendant told him that he hated his stepson because the infant "looked so much like his natural father."
In his confession after his arrest, the defendant admitted that he choked the infant until he stopped breathing: "I choked him until he was almost out of breath, and I have done this several times before, . . . I would always do this until he almost passed out, and I would breathe back into him and gethim started breathing again." (Emphasis added.) The defendant stated that, at the time he hit Jamie in the stomach with his fist, he did not feel that the blow was severe enough to kill him.
Any conceivable doubt the jury may have had about the degree of the defendant's guilt was removed by the evidence the defendant presented in his own behalf. The defendant testified that he abused the infant but could not remember exactly how and what he did: "I don't know how I abused the child. All I know is that I abused him." Although maintaining that he did not intend to hurt or kill the infant, the defendant admitted that he intentionally struck him.
The defendant testified that he hit the infant for no reason: "It was nothing that he did that caused me to do it. * * * He never gave me no reason to do it." The defendant "knew that (he) wasn't being right to the children * * * (b)y abusing them" and recognized that he had "a problem". He admitted that in the past he had hit Jamie on the back "too hard".
The defendant did not deny choking the infant until he was unconscious and then starting him breathing again as he confessed to the police but merely stated that he "did not remember."
The defendant's mother testified that the defendant told her in March of 1981 that he was "just not treating the kids right" and that "he just couldn't help it."
This is not a case of inadvertent risk creation characteristic of criminally negligent homicide. The defendant's actions on the morning of the infant's death show a complete disregard for the life of the helpless infant.
 "Somewhere along there I grabbed him and hit him and his nose started bleeding, . . . so to try and make him be quiet, I started choking him. I choked him until he was almost out of breath, and I have done this several times before, . . . I would always do this until he almost passed out, and I would breathe back into him and get him started breathing again. I . . . threw him on the couch . . . I hit him again in the stomach and told him to get up on the bed. And of course being as little as he was he didn't understand. So I feel like I was made, and I hit him again in the stomach. . . . I stuck his head under the water (in the tub) until I heard him choke, and I brought him up and took him back in there on the couch. I sat him down on my lap and I think I put my hand around his throat again. I held the pressure points together until he almost passed out, and I started shaking him and calling his name. That is when my wife walked in. . . . I told her to call the paramedics, and then I started giving him mouth-to-mouth."
The killing in this case was not accidental. A killing is not accidental when the act causing death is done intentionally.Lewis v. State, 96 Ala. 6, 10, 11 So. 259 (1891). Any contention that the death was accidental "ignores the nature of the enterprise that the defendant . . . (was) engaged in."Sanders v. State, 16 Ala. App. 511, 513, 79 So. 504 (1918). In the opinion of this Court there was no rational basis for a verdict of criminally negligent homicide. *Page 166 Wesley v. State, 424 So.2d 648, 652 (Ala.Crim.App. 1982).
It could be argued that the defendant's testimony that he did not intend to hurt or kill the infant supplies some evidence that he failed to perceive the substantial and unjustifiable risk he had created and was therefore only guilty of criminally negligent homicide. However, viewing the undisputed evidence of the defendant's vicious and heinous treatment of the infant on the morning of his death, we find such a contention completely irrational.
However, even if there existed evidence that the killing was the result of mere criminal negligence, the judge's failure to instruct on criminally negligent homicide does not warrant a reversal.
The trial judge charged the jury on intentional murder, reckless murder[3], and manslaughter[4]. The submission to the jury of manslaughter as a lesser included offense of murder does not necessarily entitle a defendant to a jury charge on criminally negligent homicide as a lesser included offense. People v.Duncan, 83 Misc.2d 608, 372 N.Y.S.2d 879, 882 (1975), affirmed,55 A.D.2d 690, 389 N.Y.S.2d 41 (1976).
"(B)efore a reversal of the judgment is to be had it must appear to the appellate court that the error complained of has probably `injuriously' affected the substantial rights of the parties." Bryson v. State, 264 Ala. 111, 113, 84 So.2d 785
(1956); Rule 45, A.R.A.P. Our consideration of the entire record firmly convinces us that the verdict would not have been different if the error had not been committed and if the jury had been charged on criminally negligent homicide. Pope v.State, 174 Ala. 63, 79, 57 So. 245 (1911). We fully recognize that generally a verdict finding the defendant guilty of a higher offense will not render harmless or innocuous an error committed in failing to charge on a lesser included offense.Hunter v. State, 335 So.2d 194, 199-200 (Ala.Crim.App.), cert. denied, 335 So.2d 203 (Ala. 1976). However, this rule should not be applied blindly or thoughtlessly. Application of that rule in this case is manifestly unjust and simply unsound.
In State v. Mattingly, 23 Or. App. 173, 541 P.2d 1063 (1975), S.Ct. review denied (1976), the trial judge refused to instruct on criminally negligent homicide and the defendant was convicted of murder. His conviction was affirmed despite that error.
 "Thus the distinction between (reckless) murder and manslaughter is only in the degree of awareness that death is a likely result which exists in the actor's mind at the time of the act. Since the jury was properly instructed on both murder and manslaughter and returned the verdict of guilty of murder, it must have found that the defendant was not simply aware of the risk that he had created, but that he had that higher degree of awareness which made his recklessness so extreme as to constitute the mental state necessary to the crime of murder. Given this, it would be illogical to conclude that the jurors, if instructed on criminally negligent homicide, might possibly have found that the defendant was unaware of the risk of death and therefore only guilty of that lesser offense.
 "Thus, it cannot be said that the failure to instruct on criminally negligent homicide prejudiced defendant by subjecting him to the
 `* * * danger that a jury, certain that the defendant is guilty of some criminal conduct but uncertain about the precise crime charged, may elect to bring in a verdict of guilty on that crime rather than to grant the defendant *Page 167 
outright acquittal.' State v. Williams [270 Or. 152], 99 Or.Adv.Sh. 1934, 1942, 526 P.2d 1384, 1387
(1974), dissenting opinion.
 "If the jury had been instructed only on one offense or if the jury had found the defendant here guilty of manslaughter, we would have a different situation, and very likely a different result." Mattingly, 541 P.2d at 1065.
The reasoning of Mattingly is logical and compelling. We apply it to this cause and find that the failure to instruct on criminally negligent homicide could not have prejudiced the defendant in any manner. Any speculation that the jury might have found the defendant guilty of criminally negligent homicide is dissipated by the fact that they found him guilty of intentional murder. State v. Freeman, 275 N.C. 662,170 S.E.2d 461, 465 (1969), and cases cited therein. In Howell v.State, (Ms. 81-877, January 17, 1983) 431 So.2d 1328 (Ala. 1983), our Supreme Court recognized that the statute on criminal negligence rejects and is inconsistent with a specific intent to commit an offense.
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966).
[2] At the hearing on the motion to suppress, Parker testified on cross examination:
 "Q. (Did you say) And they are going to make an arrest unless one of you confess.
"A. No, I did not say that.
 "Q. You didn't make the statement — unless one of you confess or both of you?
"A. No, not at that point in time I didn't."
Although Parker denied making the statement "at that point in time", there is no evidence that such a remark was made at any other time.
[3] A person commits the crime of murder if "under circumstances manifesting extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to a person other than himself, and thereby causes the death of another person." Section 13A-6-2 (a)(2). In Northington v.State, 413 So.2d 1169 (Ala.Cr.App. 1981), cert. quashed,413 So.2d 1172 (Ala. 1982), we held that reckless murder as defined by this section does not apply where the defendant's acts are specifically directed at a particular person and no other.
[4] "Recklessly" causing the death of another. Section 13A-6-3
(a)(1).