[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 269 
James Larry McLaughlin, Jr., was indicted for capital murder, was convicted of murder, and was sentenced to 60 years' imprisonment. On this appeal of that conviction, he raises five issues.
One of those issues, the failure of the trial court to instruct the jury on the lesser included offense of reckless manslaughter, has merit and entitles the appellant to a new trial. In the interest of judicial economy, we also address the remaining issues which are likely to occur on retrial.
 I
The victim in this case was 33-year-old Cynthia Carr, the appellant's mother-in-law. Several years prior to the events at issue here, the appellant had a romantic relationship with the victim, who was then Cynthia Butler. He moved in with Ms. Butler, her 8-year-old twin sons, and her 12-year-old daughter, Barbara. The appellant and Cynthia Butler later "broke up," but the appellant continued to live in the same house with Ms. Butler, her new boyfriend (and later husband) Frankie Carr, and her three children. The appellant became romantically involved with 12-year-old Barbara Butler, the victim's daughter. The appellant and Barbara Butler ran away together and lived in Georgia for a time. When they returned to Alabama, Barbara was pregnant with the appellant's child. Several months after the birth of Shea Butler in 1985, the appellant and Barbara Butler were married. They lived together until May 26 or 27, 1989, when Barbara left the appellant because he was "beating her." Barbara and three-year-old Shea went to live with Barbara's mother and step-father, Cynthia and Frankie Carr.
On May 30, 1989, the day the victim died, the appellant went to the Carr residence several times to see his wife and daughter. The first time, about 9:00 a.m., he spoke with Frankie Carr, who told the appellant to "hit the road." The second time, about 1:30 p.m., Frankie Carr ordered the appellant to get off his property. The appellant began cursing and left. The appellant was seen driving by the residence on at least one other occasion that day.
About 7:00 p.m., the appellant's sister, Karen Ponds, drove up to the Carr home, spoke to Barbara McLaughlin and Cynthia Carr, and asked to see Shea. The two women refused to allow the appellant's sister to see the child. According to Karen Ponds, Cynthia Carr stated that none of the appellant's family was welcome there and said, "If [your] damn brother come[s] over here [I'll] blow a hole through him." Barbara McLaughlin denied that her mother, the victim, made that statement. Karen Ponds left, told the appellant what happened, and the two of them went to Danny Osment's house. *Page 270 
The appellant obtained a gun from Danny Osment and returned to the Carr residence. He got out of his car with the gun in his hand and started toward the Carr's front porch, where Cynthia Carr, Barbara and Shea McLaughlin were sitting. Cynthia Carr picked up the child and ran into the house as Barbara McLaughlin tried to close and lock the front door. The appellant wedged the gun into the doorway, flung open the door, and followed Cynthia Carr, who was still holding Shea, to the kitchen. As Cynthia Carr and the appellant reached the kitchen, Carr's twin sons and several of their friends rushed out the back door. Barbara McLaughlin, who had been thrown against the wall when the appellant burst through the door, was on the living room floor.
There were no eyewitnesses to the shooting. Barbara McLaughlin, the twin boys, and their friends heard the appellant say to Cynthia Carr, "Bitch, stay out of my business," or words to that effect, and then, within a matter of seconds, they heard a gunshot.
The appellant left the scene with Shea. He was arrested eight hours later at his sister's home, and Shea was returned to her mother. Cynthia Carr died of a gunshot wound to the head. The medical evidence also revealed that she had a large bruise on the top of her foot and a cut on her bottom lip.
The appellant testified in his own behalf. He admitted that he pointed the gun at Cynthia Carr's head, but denied that he intended to kill her. He testified that he struggled with Ms. Carr in an attempt to wrest his daughter Shea away from her, that he and Ms. Carr hit the floor, and that the gun accidentally discharged.
The appellant said that he returned to the Carr residence with a loaded gun because he wanted to see his daughter and he was scared after hearing from his sister of the threat made by Cynthia Carr that he could "just forget seeing Barbara or Shea," and that "if he c[a]me over [t]here and trie[d] to get his baby, [the victim was] going to blow a hole in him." The appellant testified that as he exited his vehicle, the gun, which had been in his back pocket, began to fall out, so he held onto the firearm as he approached the Carr residence.
The trial court instructed the jury on the charged capital offense and on the lesser included offenses of intentional murder, reckless murder, felony murder, and sudden heat of passion manslaughter. The court refused to charge on reckless manslaughter, criminally negligent homicide, and accident.
The requested instructions on criminally negligent homicide and accident were properly refused because they were not supported by the evidence. However, the court erred by charging on reckless murder and by failing to charge on reckless manslaughter.
A person commits the crime of reckless murder if "[u]nder circumstances manifesting extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to a person other than himself, and thereby causes the death of another person." Ala. Code 1975, § 13A-6-2(a)(2). Although reckless murder may, under some circumstances, be an included offense of murder committed during the course of a burglary, see § 13A-5-40(b) (Supp. 1990) ("Subject to the provisions of section 13A-5-41, [reckless] murder as defined in section 13A-6-2(a)(2) . . . may be a lesser included offense of [a] capital offense"), there was no rational basis for a charge on reckless murder here.
An instruction on reckless murder is not warranted if the accused's "conduct was directed toward one individual rather than human life in general." Thomas v. State, 517 So.2d 640
(Ala.Cr.App. 1987). "The element of 'extreme indifference to human life' by definition, does not address itself to the life of the victim, but to human life generally." Northington v.State, 413 So.2d 1169, 1171 (Ala.Cr.App. 1981), cert. quashed,413 So.2d 1172 (Ala. 1982). "[A] reckless murder charge is not applicable where the acts resulting in death are directed to one or more particular persons." Walker v. State,523 So.2d 528, 538 (Ala.Cr.App. 1988) (emphasis added). Because it was undisputed that the appellant pursued *Page 271 
and pointed a gun at a particular victim, the evidence did not support the reckless murder charge.
Although the trial court's charge on reckless murder was error, the error was invited by the appellant's specific request for the charge and therefore does not constitute grounds for reversal. "The doctrine of invited error has been specifically applied to possible error resulting from the defendant's request for a particular jury instruction."Leverett v. State, 462 So.2d 972, 977 (Ala.Cr.App. 1984), and authorities cited therein.
In contrast, the court's failure to give the appellant's requested charge on reckless manslaughter does constitute grounds for reversal. Reckless manslaughter may be a lesser included offense of intentional murder. Gray v. State,574 So.2d 1010 (Ala.Cr.App. 1990); Paige v. State, 494 So.2d 795
(Ala.Cr.App. 1986). "A person commits the crime of manslaughter if [h]e recklessly causes the death of another person." §13A-6-3(a)(1).
 "A defendant who recklessly causes another's death commits manslaughter if he 'consciously disregard[ed] a substantial and unjustifiable risk that his conduct would cause that result.' Model Penal Code and Commentaries, § 210.03, Comment 4 (1980). The difference between the circumstances which will support a murder conviction and the degree of risk contemplated by the manslaughter statute is one of degree, not kind. From a comparison of Sections 210.03 and 210.02 of the Model Code, it appears that the degree of recklessness which will support a manslaughter conviction involves a circumstance which is a 'gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation,' but is not so high that it cannot be 'fairly distinguished from' the mental state required in intentional homicides."
Ex parte Weems, 463 So.2d 170, 172 (Ala. 1984).
An instruction on reckless manslaughter should have been given in this case because the jury could have found that the appellant acted recklessly, rather than intentionally, when he shot Cynthia Carr. Medical evidence indicating that Cynthia Carr's body had a recent bruise on her foot and a cut on her lip supported the appellant's version of the facts that he and the victim struggled before the gun discharged. The jury could have determined that the appellant disregarded a known risk of harm by pointing a loaded gun at Ms. Carr and by struggling with her while the gun was in his hand. See Ex parte Weems, 463 So.2d at 173, wherein the court held that the accused's carrying a loaded pistol into a cafe amounted to a conscious disregard of a substantial and unjustifiable risk and "present[ed] a clear case" of reckless manslaughter when the pistol discharged and hit an unintended victim. See alsoAnderson v. State, 507 So.2d 580 (Ala.Cr.App. 1987) (wherein the court held that reckless manslaughter charge should have been given in case where accused armed himself and returned to the scene of a prior difficulty); White v. State, 587 So.2d 1218
(Ala.Cr.App. 1990) (wherein the trial court instructed the jury on reckless manslaughter in prosecution for murder during the course of a burglary when the accused forced his way into the residence where his estranged wife was living and shot her).
The trial court's error in failing to charge on reckless manslaughter was not harmless even though the jury found the appellant guilty of murder. Compare Ex parte Jordan,486 So.2d 485, 489 (Ala. 1986) ("Although the jury was given the opportunity to apply the elements of manslaughter and criminally negligent homicide to the facts of this case, the jury rejected these theories to reach a verdict of guilty on the greater offense of murder. Therefore, we must logically conclude that an instruction on vehicular homicide, although proper, would not have affected the outcome of this case");Phelps v. State, 435 So.2d 158, 167 (Ala.Cr.App. 1983) ("Any speculation that the jury might have found the defendant guilty of criminally negligent homicide is dissipated by the fact that they found him guilty of intentional murder"). *Page 272 
Jordan and Phelps stand for the proposition that when the jury has been charged on a lesser offense and it convicts on the greater offense, the failure to charge on any other lesser offense is harmless. The reasoning is: the jury's rejection of a guilty verdict on one less culpable offense implies that they would have rejected a guilty verdict on any other less culpable offense. Applying that reasoning to the facts of this case would be unsound.
Here, the jury's rejection of sudden heat of passion manslaughter cannot be deemed an implicit rejection of the theory underlying reckless manslaughter. The offense of sudden heat of passion manslaughter identified in §§ 13A-6-2(b) and13A-6-3(a)(2) sets out "the law of mitigating an intentionalmurder to manslaughter if committed under a naturally engendering passion." Ala. Code 1975, § 13A-6-2(b) (Commentary at 151) (emphasis added). However, the offense of manslaughter identified in § 13A-6-3(a)(1) describes a reckless homicide.
Thus, the jury's rejection of sudden heat of passion manslaughter did not represent a repudiation of the less culpable mental state of recklessness; it represented a repudiation of an intentional homicide committed "under a naturally engendering passion." Moreover, unlike Jordan andPhelps, we do not know that the jury convicted the appellant of an intentional homicide. The jury returned a verdict of "guilty of murder as charged in the indictment." Because they were charged on felony murder and (erroneously) on reckless murder, neither of which requires intentional conduct, we cannot determine whether their general verdict represents a decision that the appellant was guilty of an intentional homicide.
Since there was evidence from which the jury might have found that the acts resulting in the discharge of the gun were reckless rather than intentional, there was a rational basis for an instruction on reckless manslaughter, and the failure to give that instruction was not harmless.
There was no rational basis for a charge on criminally negligent homicide.
 "An instruction on criminally negligent homicide is proper only where the victim's death was caused by the defendant's inadvertent creation and subsequent disregard of a risk of harm of which he should have been aware, but which in fact he was not aware of. Weems v. State, 463 So.2d 170
(Ala.Cr.App. 1984); Phelps v. State, 435 So.2d 158
(Ala.Cr.App. 1983); Model Penal Code and Commentaries § 210.04, Comment 1. To warrant the giving of such an instruction there must be some evidence that the defendant was not aware of the risk he was creating. Wakefield v. State, 447 So.2d 1325 (Ala.Cr.App. 1983); § 13A-2-2, Code of Alabama 1975.
 "In Robinson v. State, 441 So.2d 1045, 1047
(Ala.Cr.App. 1983), this court observed that a person 'who intentionally draws a gun in response to or in anticipation of a confrontation with another is certainly aware of the risk that the gun might discharge; therefore he cannot be guilty of mere criminal negligence.' "
Wiggins v. State, 491 So.2d 1046, 1048 (Ala.Cr.App. 1986) (emphasis in original). See also Ex parte Cason, 515 So.2d 725
(Ala. 1987) (evidence that accused drew a gun and shot deceased precluded a charge on criminally negligent homicide).
There was also no rational basis for an instruction on the law of accident. "A homicide by accident is an excusable homicide. It is an unintended homicide which occurs in thecourse of performing a lawful act, without criminal negligence." 2 C. Torcia, Wharton's Criminal Law § 136 (14th ed. 1979) (quoted in Edwards v. State, 570 So.2d 829, 830
(Ala.Cr.App. 1990)) (emphasis added).
 " 'If by misfortune or misadventure, while in the performance of a lawful act, exercising due care, and without intention to do harm, human life is taken, the law will excuse. There must, however, be a concurrence of these facts, and the absence of any one will involve in guilt.' Tidwell v. State, 70 Ala. 33, 44-45 (1881), quoted in Turner v. State, 38 Ala. App. 73, 77, 77 So.2d 503, 506
(1954), cert. denied, 262 Ala. 704, 77 So.2d 506
(1955). *Page 273 
 " 'Where the death of a human being is the result of accident or misadventure, in the true meaning of the term, no criminal responsibility attaches to the act of the slayer. Where it appears that a killing was unintentional, that the perpetrator acted with no wrongful purpose in doing the homicidal act, that it was done while engaged in a lawful enterprise, and that it was not the result of negligence, the homicide will be excused on the score of accident or misadventure. Such accident may be shown under a plea of not guilty, and if established, requires a verdict of not guilty. Action accompanied, not only with no intent to do harm, but also with a reasonable belief that no harm is possible, is clearly wanting in every essential element of crime. Under this rule, a homicide is excused when caused by the discharge of a gun or pistol which the slayer did not intentionally point at the deceased, and while he was not engaged in any unlawful act, and without any carelessness or negligence on his part, for example where the slayer is hunting, or where the accused is lawfully attempting to take a gun from the victim and it is accidentally discharged, or where the accused is lawfully acting in self-defense and the victim meets death by accident, through the unintentional discharge of a gun, or the like.
 " 'On the other hand, a homicide is not excusable on the ground of accident or misadventure unless it appears that the act of the slayer was lawful and free from negligence. 40 Am.Jur.2d Homicide § 112 (1968) (footnotes omitted).' "
Edwards v. State, 570 So.2d at 830-31. If, as we have held, one who "intentionally draws a gun in response to or in anticipation of a confrontation with another is certainly aware of the risk that the gun might discharge" and is, therefore, at least guilty of a reckless manslaughter, Wiggins v. State, 491 So.2d at 1048, he cannot be absolved of the homicide on the basis of accident. The theories underlying "accident" and "recklessness" are logically incompatible since recklessness requires conscious disregard of a known risk of harm, while an acquittal based on accident requires "a reasonable belief that no harm is possible."
Here the charge on accident was correctly refused. The appellant was not performing a lawful act, exercising due care, or acting with a reasonable belief that no harm was possible when he brandished a firearm and, having been warned twice to stay away from the victim's residence, he forced his way into the victim's home and pointed a loaded gun at her.
 II and III
The appellant contends that the Jefferson County District Attorney abused its discretion in obtaining a capital murder indictment against him when, initially, he had been arrested and bound over to the grand jury on a charge of non-capital murder. He claims that he was "selectively prosecuted" for a capital offense because other homicides, arising out of domestic disputes after the accused has entered a residence inhabited by family members, are not prosecuted as capital murders. He also argues that the trial court erred by not dismissing the indictment on this ground.
These claims are moot. The appellant was convicted of noncapital murder, and he cannot, according to established principles of double jeopardy, be retried for capital murder. See Gilchrist v. State, 585 So.2d 165 (Ala.Cr.App. 1991). Moreover, we reject the appellant's argument of "selective prosecution." In this case, there was sufficient evidence which, if believed by a jury, would have warranted a finding of guilt on the burglary component of murder during a burglary. See Minshew v. State, 542 So.2d 307 (Ala.Cr.App. 1988) (evidence that accused entered residence of his estranged wife's parents and held a knife to his mother-in-law's mouth sufficient for burglary conviction); Holman v. State, 495 So.2d 115
(Ala.Cr.App. 1986) (evidence that accused had been kicked out of residence where he had been living with his girlfriend, that he had asked to be allowed to come back, and that he had been denied *Page 274 
permission sufficient for burglary conviction).
We have no evidence before us upon which to base a finding of selective prosecution by the Jefferson County District Attorney's office. We cannot conclude that the prosecutor treated this homicide differently from the way other prosecutors across the state handle similar homicides. SeeWhite v. State, 587 So.2d 1218 (Ala.Cr.App. 1990), wherein this Court upheld the capital murder conviction and death sentence arising out of a Madison County prosecution for murder during the course of a burglary, when the accused forced his way into the residence where his estranged wife was living and shot her.
 IV
The State presented evidence that, prior to the homicide, the appellant had several conversations with Danny Osment, after which Osment gave the appellant a gun. The State also presented evidence that, after the homicide, the appellant had several conversations with Lt. Lynn Moore of the Jefferson County Sheriff's Department, during which the appellant made exculpatory statements.
On cross-examination of Osment and Moore, defense counsel sought to elicit certain exculpatory portions of the conversations with both witnesses. Defense counsel questioned Osment in an effort to elicit evidence that appellant wanted a gun for protection because he had been threatened by the victim's family. He sought to establish by the testimony of Lt. Moore that appellant said he had been threatened, claimed the shooting was an accident, and inquired about the condition of the victim. Ruling that these inquiries called for self-serving hearsay, the trial court sustained the State's objections to each of the questions.
The appellant's exculpatory statements to Osment before the homicide were hearsay. We can conceive of no exception to the hearsay rule under which evidence that the appellant told Osment he wanted the gun for protection would be admissible. The rule that an accused in a homicide prosecution may show,under a plea of self-defense, that at the time of arming himself, he made statements indicating that his purpose was self-protection, Bedsole v. State, 274 Ala. 603, 150 So.2d 696
(1963); Colvin v. State, 260 Ala. 338, 70 So.2d 654 (1954), does not apply here. The appellant did not claim self-defense; the evidence does not support that theory; and the jury was not instructed on that issue.
The principle that an accused in a murder prosecution may prove, in order to establish the defense of accident, that he made declarations before the shooting that he thought the gun was unloaded, Jones v. State, 103 Ala. 1, 15 So. 891 (1894), also has no application here. As discussed in Part I, the facts of this case do not support a charge on the legal principles of accident. The appellant did not commit "an unintended homicide . . . in the course of performing a lawful act"; he shot the victim in the course of breaking into her home and pointing a gun he knew to be loaded at her head. These facts distinguish this case from Jones and the evidentiary principles announced there.
The appellant's exculpatory statements to Lt. Moore after the homicide are likewise inadmissible. The general rule is that the "acts, declarations and demeanor of an accused before or after the offense whether a part of the res gestae or not are admissible against him, but unless a part of the res gestae are not admissible for him." Smoot v. State, 381 So.2d 668, 671
(Ala.Cr.App. 1980); Willingham v. State, 261 Ala. 454, 458,74 So.2d 241, 244 (1954). See also Towns v. State, 449 So.2d 1273,1276 (Ala.Cr.App. 1984); Miller v. State, 441 So.2d 1038, 1039
(Ala.Cr.App. 1983); Chisolm v. State, 409 So.2d 930, 932
(Ala.Cr.App. 1981). "Res gestae is difficult to define," Baldwinv. State, 352 So.2d 1156, 1159 (Ala.Cr.App. 1977), but Alabama courts have followed the standard that
 "[w]hether the declarations of [an accused] . . . were within the res gestae of the difficulty . . . depends upon whether *Page 275 
the circumstances are such as that it may with reasonable certainty be affirmed that the declarations were produced by and instinctive upon the occurrences to which they relate rather than a retrospective narration of them. If they are the ebullition of a state of mind engendered by what happened and not a mere statement of the facts as held in memory of a past transaction; if they were made so soon after the difficulty as that, under the particular circumstances transpiring between the difficulty and the declarations, it is reasonably clear that they sprang out of the transaction and stand in relation of unpremeditated result thereto, the idea of deliberate design in making them being fairly precluded, and tend to elucidate the difficulty — they are to be regarded as contemporaneous with the main transaction, and as a part of it within the rule as to res gestae."
Nelson v. State, 130 Ala. 83, 88, 30 So. 728, 730 (1901). (Emphasis in original.) Evidence that after a homicide the accused said the killing was "accidental," Jenkins v. State,212 Ala. 484, 485, 103 So. 458, 459 (1925), stated that it was unintentional, or displayed remorse, Simon v. State, 181 Ala. 90,93-94, 61 So. 801, 802 (1913), has been excluded on the basis that such declarations "by way of explanation or exoneration of the act," Francis v. State, 188 Ala. 39, 45,65 So. 969, 972 (1914), constituted narratives of past transactions and were not "uttered instinctively, with no purpose of producing a particular effect in the future," Jonesv. State, 103 Ala. at 3, 15 So. at 891. See also Bodine v.State, 129 Ala. 106, 29 So. 926 (1901).
 V
The appellant claims that the trial court erroneously allowed expert medical testimony about the relative position of the parties at the time of the fatal shooting, in violation of the following rule stated in Ivey v. State, 369 So.2d 1276
(Ala.Cr.App.), cert. denied, 369 So.2d 1281 (Ala. 1979):
 "[I]n a murder prosecution it is not permissible for a witness, including a medical expert, to draw conclusions for the jury as to the relative positions of the parties at the time of the shooting from a mere examination of the wounds. It is not competent for a witness, expert or nonexpert, to draw inferences for the jury from the slant or angle of the wound as to the relative positions of the combatants when the fatal shot was fired. 'This would be invasive of the province of the jury and a matter of which they would be quite as competent to judge as the witness, having been given a description of the wound.' Mathis v. State, 15 Ala. App. 245, 248, 73 So. 122, 124
(1916).
 "However, a properly qualified expert may testify to the 'path of flight' or trajectory of the bullet, Wilbanks v. State, 42 Ala. App. 39, 151 So.2d 741, cert. denied, 275 Ala. 701, 151 So.2d 744 (1963). He may testify to the slant or angle of the gunshot wound and describe its character. Woods v. State, 54 Ala. App. 591, 310 So.2d 891 (1975); Mathis v. State, supra. An expert may testify about the direction from which the bullet was fired or the blow was struck, Blackmon v. State, 246 Ala. 675, 680, 22 So.2d 29 (1945), Richardson v. State, 37 Ala. App. 194, 65 So.2d 715 (1953), and may state the distance between the deceased and the barrel of the weapon at the time the fatal shot was fired. Straughn v. State, 270 Ala. 229, 121 So.2d 883 (1960)."
Ivey v. State, 369 So.2d at 1280 (on rehearing). See also Exparte Davis, 554 So.2d 1111, 1114 (Ala. 1989), cert. denied, ___ U.S. ___, 111 S.Ct. 1091, 112 L.Ed.2d 1196 (1991); Bowden v.State, 542 So.2d 335, 340 (Ala.Cr.App. 1989); Smith v. State,466 So.2d 1026, 1034 (Ala.Cr.App. 1985); Wilson v. State,430 So.2d 891, 894 (Ala.Cr.App. 1983).
Contrary to the appellant's assertion in his brief, Dr. Robert Brissie, chief medical examiner and coroner for Jefferson County, did not state that "the appellant was somewhat behind and above the victim when she was shot." Brief of Appellant at p. 43. He testified that "[t]here was a gunshot wound that was located slightly *Page 276 
above and slightly behind the decedent's left ear." (R. 619). Dr. Brissie testified that the fatal shot produced a "hard contact wound to the left side of the decedent's head." He explained a "hard contact wound" as follows:
 "When a bullet exits a muzzle of a firearm, gaseous components or gases follow the bullet to include burning or unburnt powder particles. If a projectile penetrates, for example, a surface such as the side of the head, then as the bullet penetrates, the gases follow. If it is a hard contact gunshot wound, the gas follows the projectile such that . . . the gases will tend to tear through the tissues resulting in the skin at that site ballooning out, and when enough gas is present in the tissues beneath the surface, the skin may be stretched to the extent that it actually rips the skin, creating what I would call a laceration, or a tear in the tissue, resulting from the gases causing ballooning out or t[e]nting of that skin.
 "In my opinion this was a hard contact gunshot wound because the angle of the projectile was 45 degrees from the decedent's front toward the decedent's back, and the muzzle of the suspect firearm would be expected to be pressed firmly against the surface of the skin so that gas could not be vented away from the inside tissues, i.e., along the surface of the skin. The splitting in this wound indicated that gases had actually, even in spite of the 45-degree backward angle — had escaped beneath the surface tissues, or in the subcutaneous tissues, causing ballooning of the skin and causing splitting of the skin at the latter site. . . . The absence of any bony fragmentation in the area of the site of penetration of the projectile or bullet as it entered the skull would rule out the possibility that, for example, fragmentation resulted in any of the splits."
R. 623-25. Dr. Brissie also observed that
 "black sooty stains having the appearance most consistent with apparent gunshot residue . . . extended all the way through the muscle on the left side of the head all the way down to the level of the bone on the left side of the head that extended all the way through the bone, fouling the bone on the inside of the skull. . . .
 "[T]hose gaseous components tore the scalp loose from the skull on the outside, extending backward for a distance of more than one and a half inches from front to back from the wound and also stained the tissues in the site where they tore the scalp loose and stained the outside of the skull and stained the inside of the skull and stained the inner lining of the skull, the dura matter."
Expert testimony that a hard contact wound results when the muzzle of a firearm is "pressed firmly against the surface of the skin" and the conclusion that this victim sustained a hard contact wound did not violate the rule of Ivey. The testimony did not invade the province of the jury because it described the position of the weapon and the character of the wound, not the relative positions of the combatants when the wound occurred. See White v. State, 294 Ala. 265, 272, 314 So.2d 857,863 (wherein the court held that an expert was properly allowed to testify that a certain wound would cause the victim to be knocked backward and observed that "the relative positions of the parties before a shot is fired is not a proper subject of expert testimony; the effect of a shot is") (emphasis in original), cert. denied, 423 U.S. 951, 96 S.Ct. 373,46 L.Ed.2d 288 (1975).
Ivey does not prohibit testimony about the position of a weapon. That case explains that an expert may state his opinion on the following questions: the "direction from which the bullet was fired," the "path of flight or trajectory of the bullet" and "the distance between the deceased and the barrel of the weapon," all of which describe the position of the weapon without characterizing the relative position of the parties. Dr. Brissie's testimony provided no more informationabout the relative position of the parties here than does evidence regarding "the distance between the deceased and the barrel of the gun." Straughn v. State, *Page 277 270 Ala. 229, 230, 121 So.2d 883, 884 (1960). See alsoEllis v. State, 39 Ala. App. 325, 331, 100 So.2d 725, 730
(1957), cert. denied, 267 Ala. 235, 100 So.2d 732 (1958) (wherein the court found no error in admitting expert testimony that the "pressure of the muzzle of the gun against the flesh would overcome that tendency [of the gun] to recoil").
Because the trial judge did not instruct the jury on the lesser included offense of reckless manslaughter, the judgment of conviction is reversed and the cause remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
All Judges concur.